David MASINTER, Plaintiff–Appellee, Cross–Appellant,

v.

TENNECO OIL CO., et al., Defendants–Appellees,

Marlin Drilling Co., Inc., Defendant–Appellant, Cross–Appellee,

and

Liberty Mutual Insurance Company, Intervenor–Cross–Appellee.

No. 87–3638.

United States Court of Appeals, Fifth Circuit.

March 16, 1989.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Edward J. Koehl, Jr., Thurl Stalnaker, Jr., New Orleans, La., appellant.

John K. Leach, New Orleans, La., for Liberty Mut. Ins. Co.

Robert L. Hackett, Obstreicher, Whalen & Hackett, New Orleans, La., for Masinter.

Before THORNBERRY, KING, and JONES, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellee/cross-appellant David Masinter brought this suit against appellant/cross-appellee Marlin Drilling Co., Inc. (Marlin) to recover damages for injuries sustained while working aboard a jack-up rig owned

by Marlin. The district court found Marlin 60% negligent and Masinter 40% contributorily negligent and entered judgment for Masinter. On appeal, each party asserts its own absence of negligence and challenges the district court's calculation of damages. Masinter also contends that the district court erred in reimbursing appellee Liberty Mutual Insurance Company (Liberty Mutual) for worker's compensation benefits it paid to Masinter. For the reasons discussed below, we affirm in part, vacate in part, and, subject to Masinter opting for a new trial to determine his future wage loss, render judgment for Masinter. We also affirm the judgment for Liberty Mutual in accordance with our analysis.

## Background

Prior to sustaining the injuries complained of in the present lawsuit, David Masinter worked as a sales/service representative supervising the installation of products sold by his employer Hydril, Inc. (Hydril). In late December of 1984, Hydril transported Masinter to the Marlin IV, a jack-up rig located in the Gulf of Mexico, to oversee the installation of a supply of completion tubing sold to Tenneco, Inc. (Tenneco). Pursuant to a contract, Marlin furnished Tenneco with the Marlin IV and crews to conduct the drilling operations.

Masinter's task aboard the Marlin IV required him to move between the drill floor and the pipe rack deck below the drill floor. The two levels were connected by a moveable stairway which had been placed in position by Marlin. The top of the stairway was hinged to the drilling floor and therefore moved as the floor was pivoted into proper position above the well. Once the drilling floor was properly located, the bottom of the stairway was lowered onto the pipe rack deck. In this case, when the stairway was lowered, the bottom sides of the stairway landed on an "I" beam rather than on the deck itself. The "I" beam was approximately eleven inches high, and the distance between each tread (step) of the stairway was about one foot. Since the bottom sides of the stairway rested on the eleven inch high beam, a distance of two feet between the last step and the deck was created. Had the stairway been positioned properly on the pipe rack deck, the distance between the last step and the deck would have been one foot.

In using the stairway, workers also had to negotiate a two and one-half foot wide by two inch high steel support plate which extended across the pipe rack floor near the base of the stairway. Because of plate's two inch thickness, its edges were beveled to reduce the possibility that one might stumble over it while maneuvering about the lower deck. The plate's right edge ran perpendicular to the stairway treads in such a manner that, as one descended the stairs, one's left foot would step on the beveled seam.

At 3:00 a.m. on December 28, after working an 18 to 20 hour shift, Masinter descended this stairway as he had done at least a dozen times. When he reached the lower level, he stepped on the beveled seam and severely twisted his right ankle. As a result of this incident, Masinter has undergone two surgeries and currently suffers a 20% physical disability.

Based on this injury, Masinter brought the present lawsuit against Tenneco, Marlin, and the rig manufacturer Bethlehem Steel Corporation (Bethlehem) asserting claims under the Jones Act, 46 U.S.C.App. § 688 (1982), general maritime law, and § 5(b) of the Longshore and Harbor Worker's Compensation Act (LHWCA), 33 U.S.C. §§ 901 *et seq.* Liberty Mutual intervened seeking to recover compensation benefits it paid to or on behalf of Masinter. Subsequently, the claims against Tenneco and Bethlehem were dismissed with prejudice; Masinter also withdrew his claim based on § 5(b) of the LHCWA. Prior to the nonjury trial, the district court granted Marlin's motion for summary judgment dismissing Masinter's Jones Act claim for lack of seaman status. In a unrelated summary judgment motion, the court determined that Masinter was not a longshoreman.

At trial, only Masinter's claim against Marlin based on general maritime law remained. In its original findings of fact, the district court concluded that Masinter's in-

juries were caused by the inordinate distance between the stairway's last tread and the deck and by the fact that Masinter stepped on the beveled seam. Inadequate lighting and the presence of a slippery drilling fluid on the deck floor were also found to have contributed to the accident. The court expressly noted that "both the location of the beveled edge of the [steel plate] and the location of the base of the stairs ... were *open and obvious* to the plaintiff...." The court held that Marlin had not exercised reasonable care toward Masinter but that the award would be reduced by forty percent to reflect Masinter's contributory negligence. The court also held that, pursuant to the application of the LHWCA through provisions of the Outer Continental Shelf Lands Act (OCSLA), Liberty Mutual, as the compensation carrier for Hydril, was entitled to recover the amount it had paid Masinter out of any judgment rendered in Masinter's favor.

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, Marlin filed a motion for new trial or alternatively to amend the judgment. Marlin argued that it had no duty to warn Masinter of an open and obvious defect and therefore could not have been found negligent. Marlin also contended that, given Masinter's work experience and educational background, damages should not have been calculated using the assumption that Masinter would only be able to procure future work at minimum wage. In response to this motion and Masinter's memorandum opposing the motion, the district court issued an opinion amending his initial oral findings of fact and conclusions of law.

It is noteworthy that the opinion deleted the prior statement that the defects were open and obvious to Masinter. The court's amended finding also revealed that the inadequate lighting and drilling fluid "contributed heavily" to the accident. The court held that

> Defendant is correct in stating that it has no legal duty to warn plaintiff of any hazard which is open and obvious. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406[, 3 L.Ed.2d 550] (1959); *Wiles v. Del-*

*ta Steamship Lines, Inc.*, 1976 AMC 2646 (E.D.La.1976). However, the court does not agree with defendant's argument that since it was found that the uneven nature of the stairs were known to plaintiff, this precludes any duty to warn. The fact that the physical condition of the stairway was known by plaintiff goes to the element of his contributory negligence. However, it does not absolve defendant of his duty to warn because the Court also found that the lighting on the stairs was poor and insufficient for safe passage and that there was drilling fluid on the surface where plaintiff slipped. The Court therefore feels that there was no error in finding that defendant had breached its duty of care to plaintiff.

Based on this statement and the court's continued belief that Masinter would only be able to find employment at minimum wage, the court entered judgment in the amount of $208,828.80 for Masinter. On appeal, Marlin renews its arguments that it had no duty to warn of an open and obvious danger or, alternatively, that the award was excessive. Masinter cross-appeals contending that the district court erred in finding him 40% contributorily negligent. Masinter also challenges Liberty Mutual's right to recover benefits under the provisions of the LHCWA when the court had previously ruled that he was not a longshoreman.

## Discussion

### I. Vessel Owner Negligence

The district court's finding of negligence was based on a breach of the general maritime duty of care first enunciated in *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). At trial and in the appellate briefs, all parties conceded that the *Kermarec* standard governed the present dispute. Approximately two weeks before oral argument, Marlin's counsel notified the court, pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, that § 5(b) of the LHWCA provided Masin-

ter's exclusive claim and that principles of general maritime law should have no application in the present context. We agree, however, that the district court applied the wrong law is not necessarily fatal to our ability to review the judgment. As we have noted in the past, "[w]hen the judgment of the district court is correct, it may be affirmed on appeal for reasons other than those asserted or relied on below." *Terrell v. University of Texas System Police,* 792 F.2d 1360, 1362 n. 3 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987).

■ The conclusion that § 5(b) of the LHCWA provides Masinter's exclusive remedy against the vessel owner emerges as follows: It is undisputed that Masinter, a non-seaman, non-longshoreman, was working aboard the Marlin IV, a vessel. Although Masinter was held not to be a longshoreman, the protections afforded longshoremen under the LHWCA are available to Masinter by operation of the OCS-LA which provides in part that "compensation shall be payable under the provisions of the Longshore and Harbor Workers' Compensation Act" to an employee disabled "as the result of operations conducted on the outer Continental Shelf for the purpose of ... removing ... the natural resources ... of the subsoil and seabed of the outer Continental Shelf...." 43 U.S.C. § 1333(b). Section 5(c) of the LHWCA provides in part that

> [i]n the event that the negligence of a vessel causes injury to a person entitled to receive benefits under this chapter by virtue of section 1333 [of the OCSLA], then such person may bring an action against such vessel in accordance with the provisions of subsection (b) of the section.

33 U.S.C. § 905(c). Subsection 5(b) of the LHWCA in turn allows certain covered persons injured by the negligence of a vessel to bring an action for damages against the vessel. Such action shall be "exclusive of all other remedies against the vessel." 33 U.S.C. § 905(b). Thus, Masinter's only claim against Marlin, the vessel owner, is one for negligence under § 905(b). *See*

*Lormand v. Superior Oil Co.,* 845 F.2d 536, 541 (5th Cir.1987) ("Recovery for injury to a person, other than a Jones Act seaman, working on the outer continental shelf is governed by the LHWCA...."), *cert. denied,* —— U.S. ——, 108 S.Ct. 739, 98 L.Ed.2d 774 (1988). The district court therefore erred in analyzing Masinter's negligence claim under principles of general maritime law.

In the seminal case of *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court articulated the scope of a vessel owner's duty under § 905(b). "Although *Scindia* discussed the respective duties of a vessel owner and stevedore, our subsequent jurisprudence has made it clear that the rationale of *Scindia* applies equally to questions of vessel owner liability for injuries to LHWCA-covered employees of an independent contractor working aboard the vessel." *Lormand,* 845 F.2d at 541. Thus, principles expressed in *Scindia* and its progeny from this court govern the duty Marlin owed to Masinter.

*Scindia* did not address every issue of vessel liability under § 905(b), but the basic principle that the primary responsibility for the safety of the longshoremen rests upon the stevedore did emerge. *See Helaire v. Mobil Oil Co.,* 709 F.2d 1031, 1036 (5th Cir.1983). Thus, "once the stevedore's cargo operations have begun, *absent contract provision,* positive law, or custom to the contrary, the owner has no general duty by way of supervision or inspection to discover dangerous conditions that develop in the area *assigned to the stevedore." Id.* at 1036 (emphasis added). The vessel owner is not liable for injuries caused by defects " 'about which he had no duty to inform himself,' [but rather] 'is entitled to rely on the stevedores, and owes no duty to the longshoremen to inspect or supervise the cargo operations.' " *Helaire,* 709 F.2d at 1036 (citing *Scindia,* 101 S.Ct. at 1624).

*Scindia* 's broad statements of immunity have been tempered by several exceptions. In *Turner v. Costa Line Cargo Services, Inc.,* 744 F.2d 505 (5th Cir.1984) (Gee, J., dissenting), Judge Gee enumerated three

exceptions in which a vessel owner may be found liable for injuries occurring after stevedoring operations have begun. Vessel owner liability may arise:

1. [if the vessel owner fails] to warn on turning over the ship of hidden defects of which he should have known, [Exception 1]

2. for injury caused by hazards under the control of the ship, [Exception 2]

3. [if the vessel owner fails] to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of 'obviously improvident' judgment, means to work on in the face of it and therefore cannot be relied on to remedy it. [Exception 3].

*Id.* at 512.[1]

■ In applying both *Scindia*'s general rule and its exceptions we are persuaded that it is beyond peradventure that Marlin owed to Masinter a duty of care to take precautions necessary to avoid exposing Masinter to the hazardous conditions created by the placement of the stairway. We reach this conclusion by noting that the present case does not involve a vessel owner "turning over" the control of the vessel to a stevedore or independent contractor. Rather, Marlin was *contractually bound* to conduct the drilling operations and remained in control of the vessel to effectuate this obligation. In these circumstances, *Scindia*'s general rule absolving a vessel owner of its duty to warn "absent contract provisions" provides Marlin with an illusory safe harbor.

Furthermore, *Scindia*'s second exception broadly states that a vessel owner remains responsible "for injury caused by hazards under the control of the ship." Marlin's answers to interrogatories and admissions clearly indicate that its crew was solely responsible for placing the stairway in the position it was in when Masinter

twisted his ankle. Thus, by remaining in control of the vessel, Marlin had a continuing duty of care to those aboard the vessel.

■ We are unpersuaded by Marlin's argument that it had no duty to protect Masinter from a condition which was open and obvious.[2] We adhere to the Supreme Court's pronouncement that a vessel owner remaining in control of the vessel "must exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas ... under the active control of the vessel...." *Scindia*, 101 S.Ct. at 1622 (emphasis added); *See also Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535 (5th Cir.1986) (vessel owner not relieved of duty of care where he remained in control of work area). This position comports with the second *Scindia* exception which, as referred to on several occasions by this court, *see Helaire*, 709 F.2d at 1036; *Turner*, 744 F.2d at 512, broadly states that a vessel owner shall be liable for injury caused by hazards under the control of the ship. Thus, neither the Supreme Court nor this court has intimated that a vessel will be relieved of its duty of care under § 905(b) simply because the hazard is open and obvious.

This court encountered a similar situation in *Turner* a case in which the vessel owner relinquished control of part of the vessel to a stevedore and its crew of longshoremen. One longshoreman was required to traverse a portion of the deck which had not been assigned to the stevedore and hence remained under the control of the vessel owner. A pile of debris leaking oil across that part of the deck under the owner's control created a hazard which, as the plaintiff testified, was apparent at a glance. While crossing the deck, the plaintiff slipped and injured himself.

Relying on *Scindia* and *Helaire*, the majority held that the vessel owner remained liable for injuries occurring in areas under

---

1. These same exceptions were enumerated in a less concise format by the majority in *Helaire*, 709 F.2d at 1036.

2. Whether the district court found the hazard to be open and obvious remains unclear. The fact that the court's amended findings of fact deleted the reference to the open and obvious condition suggests that the court found the hazard not to be open and obvious. On the other hand, language from the district court's final opinion can be construed to suggest the opposite.

its control. The majority did not address the implications of the fact that the hazard was open and obvious. However, Judge Gee, dissenting on other grounds, noted that the *Scindia*'s first exception, *i.e.*, liability for failure to warn on turning over the ship of hidden defects of which the shipowner should have known, was inapplicable because the hazard was obvious. Nevertheless, Judge Gee would have remanded for a determination of whether the area in which the injury occurred was an area over which the shipowner had relinquished control. That is, Judge Gee would have remanded for a determination of the applicability of *Scindia*'s second exception. The important point to be gleaned from *Turner* is that obviousness, though relevant to the first exception, bears no significance to a vessel owner's duty under the second exception.

Of course, § 905(b) does not impose strict liability on vessel owners for injuries resulting from such hazards. Rather, liability only arises if the vessel owner breached its duty of care. As mentioned previously, the district court found both Marlin and Masinter partially negligent for the accident. The question of negligence in maritime cases is factual, and, unless the district court's finding was clearly erroneous, it will not be disturbed on appeal. *Lormand*, 845 F.2d at 543 n. 9.

■ The record reveals ample evidence to support the district court's finding that Marlin was negligent. Masinter's expert testified that the inordinate distance between the deck and last tread attributable to Marlin's placement of the stairway on the "I" beam presented a hazard. Compounding this danger was the beveled seam extending out from the steps. Marlin does not dispute that the stairway was placed on the "I" beam or that the seam ran perpendicular to the stair. A finding of negligence on this evidence alone is sufficient to withstand the clearly erroneous standard. In addition, testimony was elicited from both sides as to the adequacy of the lighting. That the district court found Masinter's witness more credible than Marlin's is not clearly erroneous. Finally, the court

found that the presence of drilling fluid "contributed heavily" to the accident. Based on Masinter's testimony at trial that he did not slip, emphasis on the slippery condition of the deck surface appears clearly erroneous. Nevertheless, a finding of negligence based on the remaining three conditions—the position of the stairway, the inadequacy of lighting, and the location of the beveled seam—cannot be said to be erroneous and thus will not be disturbed.

■ The record also contains evidence substantiating the finding that Masinter's own negligence contributed to his injuries. Masinter testified that he had been up and down the stairs at least a dozen times during the shift and that, if he had looked directly at the area of the deck where the seam was located, he would have seen the hazard. Others testified that they had negotiated the stairs with no problem. Lastly, there is some evidence to suggest that Masinter should have used the "I" beam as an intermediary step between the last stairway tread and the deck. This evidence militates against disturbing the district court's finding of contributory negligence.

## II. Damages

Both parties appeal the district court's calculation of damages. A trial judge's assessment of damages is considered a factual finding which, unless clearly erroneous, deserves our deference. *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 837, 102 L.Ed.2d 970 (1989). Three base components comprised the district court's award: past wage loss, future wage loss, and pain and suffering. The $50,000 amount awarded for pain and suffering is not challenged by either party on appeal.

### A. Past Wage Loss

■ Masinter argues that the record contains no evidence to support the district court's award of $30,392 for past wage loss. We disagree. Each party proffered expert witnesses who prepared schedules of past and future wage losses after taking into account various factors. The court

found Marlin's expert Dr. Boudreaux to be more credible than Masinter's witness. Dr. Boudreaux calculated past wage loss for the years 1985 and 1986 by subtracting what Masinter earned during those years from what he would have earned had he continued to work at his pre-accident income level. Based on his 1984 tax return, Masinter would have earned $38,950 in each 1985 and 1986, or a total of $76,900. Masinter's actual gross income for those years was $17,148.84 in 1985 and $23,939.00 in 1986, or a total of $40,087.84. The *pre-tax* difference between what Masinter would have made and what he earned is approximately $36,813. After subtracting taxes from this amount, it becomes evident that the award of $30,392 is adequately supported by the record.

### B. Future Wage Loss

■ The base figure used to calculate future wage loss is the difference between what a person could have earned "but for" the accident and what he is able to earn upon returning to work in his partially disabled state. Dr. Boudreaux accepted that at the time of the accident Masinter earned a yearly amount of $38,950. However, due to the dramatic reduction of the oil and gas work force attributable to the sharp decline in oil prices, Dr. Boudreaux concluded that it would be conservative to project a 25% reduction in Masinter's salary. Thus, instead of annual earnings of $38,950, Dr. Boudreaux estimated Masinter's future earnings to equal $29,212.50.

This court has said that evidence concerning the economic conditions in the oil industry is relevant in determining whether the injured person will suffer any future losses. *Book v. Nordrill, Inc.*, 826 F.2d 1457 (5th Cir.1987). Dr. Boudreaux testified that the oil and gas work force had been reduced by between forty and sixty percent. This downturn forced Hydril to lay off nine of eleven of its products representatives. From this Dr. Boudreaux concluded that even if Hydril retained Masinter his salary would be reduced. By contrast, Masinter presented no evidence to rebut these contentions. Although Masinter could have shown that Hydril's salaries

were not reduced and that he would have been retained despite the industry downturn, he declined to do so. Thus, based on the evidence in the record, we cannot say that it was clearly erroneous to conclude that "but for" the injury Masinter would have earned 75% of his 1984 earnings.

■ As mentioned, future wage loss is based on the difference between what Masinter could have earned, in this case 75% of 1984 earnings or $29,212.50, and what Masinter is able to earn. Marlin appeals the district court's finding that Masinter would only be able to return to work at minimum wage. Based on the evidence presented, we conclude that this finding is clearly erroneous. All of the evidence, including that adduced from Masinter's own physician, indicate that Masinter is an intelligent man with a high school diploma months away from receiving a business degree from a junior college. Since Masinter was laid off in July of 1986, he has applied for positions as a product representative with Lockheed, Boeing, and General Dynamics which, according to a U.S. Department of Labor handbook, pay approximately $24,000 annually. Although Masinter has received form letters stating that positions are currently unavailable, there is no indication that Masinter has not been hired because of his physical disability. We think it is also significant that Masinter had not applied for positions only paying minimum wage. After careful review of the record, we are unable to locate any support for calculating future lost wages based on Masinter's ability to only earn minimum wage. Calculation of future wage loss should have been predicated on the only assumption supported by the record, *i.e.* that Masinter was qualified to secure employment paying $24,000 per year. The failure to do so was clearly erroneous.

The future wage loss calculation based on the erroneous assumption that Masinter would only be able to return to work at minimum wage resulted in an excessive judgment. "Having determined that an award is excessive, this court may either order a new trial on damages or may give

the plaintiff the option of avoiding a new trial by agreeing to a remittitur of the excessive portion of the award." *Hernandez*, 841 F.2d at 587. We follow this circuit's "maximum recovery rule" under which a remittitur may reduce the award only to the maximum amount the district court could properly have awarded. *Id.*

Given the present record, the only proper award for future wage loss should have incorporated Masinter's ability to earn $24,000 annually. Based on the undisputed discount factor of 5.75%, Masinter's ability to earn $24,000 in the future, and a 25% reduction in his 1984 salary, Dr. Boudreaux calculated the after-tax, present value of lost future wages to equal $60,487. Thus, the proper award should have been:

Past Wage Loss ................... $30,392.00
Pain and Suffering ................ 50,000.00
Future Wage Loss ................. 60,487.00

Total ............................ $140,879.00
Less 40% (contributory negligence) ........................... 56,351.60

Masinter's Net Recovery ......... $ 84,527.40

We hold that solely with respect to the issue of future wage loss Masinter may either agree to a remittitur in the amount of $124,301.40, or he may opt for a new trial on this issue.

III. Liberty Mutual's Entitlement to Reimbursement for Compensation Benefits Paid

■ As we have already discussed, Masinter was entitled to the benefits available under the LHCWA through operation of § 4 of the OCSLA. The parties stipulated that Liberty Mutual had paid compensation and medical benefits to or on behalf of Masinter in the amount of $59,320.32. The LHWCA does not expressly provide that a compensation carrier may recoup its disbursements from judgment proceeds. However, we have held that "the employer has a subrogation right to be reimbursed from the worker's net recovery to the extent of the compensation benefits it has paid." *Peters v. North River Insurance*

Co. of Morristown, New Jersey, 764 F.2d 306, 312 (5th Cir.1985). In the present case the insurer, not the employer, paid the benefits. Nevertheless, § 33(h) of the LHCWA entitles a carrier who has made compensation payments to be subrogated to any rights available to the employer under § 933. We therefore hold that Liberty Mutual is entitled to recoup its compensation payments from Masinter's net recovery.[3]

### Conclusion

Although general maritime law does not govern the present dispute, we AFFIRM the district court's findings of liability based on a breach of the standard of care required by § 5(b) of the LHWCA. With respect to damages, we AFFIRM the court's calculation of past wage loss, VACATE the district court's calculation of future wage loss, and, unless Masinter opts for a new trial to determine this component of the award, RENDER judgment for Masinter in the amount of $84,527.40. We also AFFIRM the judgment in favor of Liberty Mutual entitling it to receive $59,320.32 in preference and priority out of Masinter's award.

---

**3.** Even if Masinter opts for a new trial on the future wage loss component of damages and is awarded less than $59,320.32 from such trial, Liberty Mutual will only be entitled to reimbursement from Masinter's net recovery.