**Steven Carl FRUGE and Penny Stelly Fruge, Plaintiffs–Appellants,**

v.

**PENROD DRILLING CO., Defendant–Appellee.**

No. 89-4813.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1990.

Lawrence D. Wiedman, Allain F. Hardin, Wiedman & Fransen, New Orleans, La., for plaintiffs-appellants.

Alan K. Breaud, Roy, Carmouche, Bivins, Judice, Henke & Breaud, Lafayette, La., for defendant-appellee.

Before CLARK, Chief Judge, THORNBERRY and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

Steven C. Fruge filed a negligence action arising under the general maritime law of the United States and the Longshore and Harbor Workers' Compensation Act, *see* 33 U.S.C. § 905(b), and under Louisiana law based on diversity of citizenship. From a jury verdict finding no negligence on the part of Penrod Drilling Company, he appeals. We affirm.

## I.

Steven C. Fruge was an offshore oil worker employed by Petro–Drive, Inc. (Petro–Drive), a contractor which assembles and installs conductor pipe at drilling sites. Fruge was working offshore on a jack-up barge owned and operated by Penrod Drilling Company (Penrod) when he was injured.

An understanding of the mechanisms involved is important to the resolution of the legal issues raised. Conductor pipe serves as a shield for the drilling pipe between the rig floor and the sea bed. The drill pipe is later placed within it. Fruge's injury occurred during the process of assembling and placing the conductor pipe. This involved raising forty-foot sections of pipe with a crane, hauling them into position in the derrick, stabbing the lower end into already assembled sections of pipe, welding the new section at the lower joint, and

lowering the pipe assembly forty feet further into the water. An interval in this process begins on a catwalk below the rig floor. "Pad-eyes" are welded to the exterior of the conductor pipe and serve as the connecting point between the pipe and shackles, which are attached to a lifting sling on the crane. Before hoisting a pipe, workers insert a threaded shackle pin through one opening on the shackle and through the pad-eye. The threaded end of the pin is then screwed into the opposing opening of the shackle, which is also threaded. The pipe is then raised by the crane with a sling. Petro–Drive and its employees were responsible for this work. All of the shackles and pins were supplied by, and were the property of, Petro–Drive. The shackle pins used here weighed between eight and fifteen pounds each. Fruge was injured when one of these shackle pins fell approximately forty feet onto his left shoulder.

After the upper pipe is stabbed into the lower pipe and welding has begun, the shackles and pin remain attached to the pad-eyes on the upper part of the pipe. At that point, the Penrod crane operator slacks off on the slings. Guides then position and steady the upper end of the pipe while the welding proceeds. During this part of the process, the shackles and pins do not bear the weight of the pipe. It is usual practice not to disconnect the shackles from the pad-eyes until after completion of the welding. The welding takes between one and two hours to complete. This particular weld had been in progress at least thirty minutes before the incident. Prior to Petro–Drive personnel pulling the pin, it is normal for the slackened crane sling and the shackles to shake due to the surge of the waters below. It was at this time that the pin came loose and fell onto Fruge's shoulder.

Fruge was disabled because of this incident. He received workers' compensation from his employer, Petro–Drive. He underwent several operations on his shoulder and on his back. At some point, workers' compensation payments to Fruge were discontinued. The reason is not disclosed in the record. Subsequently, Fruge became increasingly detached from reality and required extensive psychiatric care, in addition to his physical needs.

Fruge sued Penrod, alleging that its employees either failed to screw the shackle pin into the shackle or did not screw it in tightly enough. It is not contended that Fruge in any way contributed to his injuries. Testimony at trial indicated that Penrod employees may have assembled the shackle and pin on this occasion, and may have done so improperly. The jury found that Penrod was not negligent. Fruge appeals.

## II.

Fruge raises three points of error. First, he argues that the trial court erred in not granting him a directed verdict or judgment notwithstanding the verdict. Second, he contends that the trial court erred in not granting him a mistrial when Penrod's counsel mentioned workers' compensation during opening argument. Third, he asserts that the trial court improperly instructed the jury on Penrod's responsibility for injuries caused by hazards on the vessel under its control.

## A.

Fruge argues that the uncontroverted evidence at trial established that Penrod employees placed the pin in the shackle. Thus, he concludes that the trial court erred in denying his motions for directed verdict and judgment notwithstanding the verdict.

When ruling upon such motions, a trial court must review the evidence in the light and with all reasonable inferences most favorable to the party opposing the directed verdict or judgment notwithstanding the verdict. *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). If the material evidence is such that reasonable and fair-minded persons could reach different conclusions based on their determination of the relevant facts, the district court would err when either directing a verdict or granting judgment notwith-

standing the verdict. *Id.* The same standard applies on appellate review. *Hinshaw v. Doffer,* 785 F.2d 1260, 1263 (5th Cir. 1986).

█ A principal issue for the jury involved whether it was Petro–Drive's or Penrod's employees who actually placed the shackle pins into the shackles during the interval in which this accident occurred. No conclusive proof demonstrated who placed the pin that caused the injury, or why it separated from the shackle. Fruge offered the testimony of five Petro–Drive employees who stated Penrod employees were involved in the handling of shackle pins on the day of the injury. However, none of those who testified recalled witnessing the placement of this particular pin. They did not know which Penrod employees might have been involved, or whether they were "roustabouts," "drill crew," or "floor hands." This testimony did not irrefutably establish Penrod was responsible for the pin placement, nor did it explain why the pin backed out.

Fruge testified that placing the pin is a very simple maneuver, which required nothing more than turning the pin by hand until it was tight. Clearly, this task required no special skill. Anyone on the rig could have placed the pin into the shackle. Penrod's counsel argued to the jury that the Petro–Drive employees might have pointed the finger at Penrod to cover their own mistake.

Penrod also put on evidence that after tension is removed from the sling during welding, the shackle is subjected to jostling due to the surge of the waters below. This movement over a thirty minute period could have caused the hand-tightened pin, then free of tension, to work loose. Fruge established only the surmise that the pin would not back out unless it was negligently placed. No proof was adduced to show that the fallen pin, which was not produced at trial, was defective. If the jury concluded the pin worked loose in the manner Penrod demonstrated, it could have found that the pin was not negligently placed in the shackle.

The *Boeing* standard commands that the jury determine credibility and weigh conflicting evidence and inferences. *Boeing,* 411 F.2d at 375. We cannot say that the evidence and testimony at trial presented no issue for submission to the jury. Therefore, the trial court's denial of a directed verdict and judgment notwithstanding the verdict is affirmed.

█ Fruge depends on these same operative facts to challenge the court's instructions regarding the doctrine of *res ipsa loquitur.* The standard by which to apply *res ipsa loquitur* is:

> when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care.

*San Juan Light & Transit Co. v. Requena,* 224 U.S. 89, 98–99, 32 S.Ct. 399, 401, 56 L.Ed. 680 (1912). Our circuit has stated:

> The doctrine is not proof and does not supply a want of proof. *"Res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur,* where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

*Cie. Des Messageries Maritimes v. Tawes,* 205 F.2d 5, 7 (5th Cir.), *cert. denied,* 346 U.S. 858, 74 S.Ct. 69, 98 L.Ed. 371 (1953) (quoting *Sweeney v. Erving,* 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913)).

*Res ipsa loquitur* may supply an inference from which the jury may conclude the defendant was negligent. While such an inference of negligence can get the plaintiff to the jury, application of *res ipsa loquitur* simply permits, but ordinarily does not compel, the inference of negligence on the part of the defendant. Thus, the burden of proof remains on the plaintiff to convince the jury to accept the inference of negligence. *Res ipsa loquitur* will not support a directed verdict or judgment notwithstanding the verdict unless the inference of negligence is so strong that no reasonable person could fail to accept it, and the defendant has offered no evidence to rebut it. *See Stillman v. Norfolk & Western Ry. Co.,* 811 F.2d 834, 837 (4th Cir.1987).

The instruction on *res ipsa loquitur* given to the jury in this case is set out in the margin.[1] This instruction correctly summarizes the applicable law. Given the evidence, a reasonable jury could find no inference of negligence on the part of Penrod, or find Penrod's explanation of causation sufficient to negate any inference of negligence. The shackle pin was Petro-Drive's property, and its placement was a part of their responsibility. The testimony by its employees that Penrod employees placed this particular pin may have been rejected as implausible or incredible. Furthermore, no proof was offered to establish that Penrod had superior means for determining the cause of the accident. Here, the "normal course of events" was a precarious and dangerous process involving employees of both Petro-Drive and Penrod. Shackle pins were subjected to hoisting forces and jostling when slackened. A rea-

sonable jury could conclude that the pin was not under Penrod's exclusive management or control, or that the accident and ensuing injury could have occurred without the negligence of the person having control of the shackle pin.

In his analysis of this doctrine, Fruge speaks in terms of "burden shifting," and contends that he put forth a quantum of proof which required Penrod to prove it was not negligent. He cites *Bianchini v. Humble Pipe Line Company,* 480 F.2d 251 (5th Cir.1973). *Bianchini* was a diversity case interpreting and applying Louisiana law. Louisiana treats *res ipsa loquitur* as "an evidentiary technique" allowing the plaintiff to show a *prima facie* case of negligence, whereupon "the burden shifts to defendant to disprove the inference of negligence or to show that he did not cause the damage." *Bianchini,* 480 F.2d at 255. We need not decide here whether Louisiana's evidentiary technique goes past procedure and confers substantive rights, nor whether, if it is substantive, Louisiana law conflicts with the federal rule applied in our other jurisprudence. Fruge did not object to the instruction given; therefore, his right to assign error is waived. FED.R. CIV.P. 51. However, Penrod did in fact offer proof explaining its actions and evidence on the mechanics of causation of the accident. A reasonable jury could rely on this proof to find for Penrod. Under either approach, the verdict is supported.

### B.

Fruge next contends that the trial court erred in denying Fruge a mistrial based

---

1. The judge's charge to the jury on *res ipsa loquitur* stated:

    "The mere fact that an accident happens does not furnish evidence that it was caused by any person's negligence, and the plaintiff must point to some negligent act or omission on the part of the defendant.

    "If you find, however, (1) that injury to the plaintiff was proximately caused by the falling shackle pin; (2) that at the time of the accident the shackle pin was under the defendant's exclusive control or management, or that the defendant had superior means for determining the cause of the accident; and (3) that in the normal course of events the accident and ensuing injury would not have oc-

    curred without the negligence of the person having control and management of the shackle pin, then you may infer that the accident and ensuing injury were caused by the negligence of the defendant, Penrod Drilling Company, under the doctrine of *res ipsa loquitur.*

    "I say that you may so infer. You are not compelled to infer negligence. You should consider all facts and circumstances in evidence.

    "If the above factors are proven by the plaintiff and you choose to infer negligence on the part of Penrod Drilling Company, the defendant bears the burden of coming forward with an explanation for the damage sufficient to rebut the inference."

upon Penrod's reference to workers' compensation benefits. The trial court's minutes on the first day of trial stated: "It is further ordered that the defendant may mention to the jury that the cutting of plaintiff's compensation benefits was a significant factor in the worsening of his psychotic condition." A minute entry on the third day of trial stated: "It is ordered that defense counsel may ask Dr. Dupuy whether the discontinuance of compensation was a contributing cause of plaintiff's functional disability, because this is in Dr. Dupuy's report."

During opening arguments, Fruge's attorney made the first mention of workers' compensation. He argues now that he made his statements only to lessen the impact of what he was sure would be Penrod's argument. His statements were:

"Well, Dr. McDaniel examined him at the request of a compensation carrier. Now, you're going to hear a little bit about compensation in this case, and the Judge will give you directions on it at the end of the trial as to how you are to consider it."

"Well, he couldn't go back to work because physically, he was unable to. Well, once they got that from the compensation people, his compensation was terminated."

"And they're going to defend on the psychiatric part of this case saying, no, that's not related to this accident. They will attempt to get in anything they can to show you that this psychiatric problem that this man had was not related to the accident. No, it came too many years after this, it did this, it did that, it was caused by—*they took him off comp.* He had financial problems, that must be what did it, you know, everything else, but this is something that they are not responsible for. That's the way they want to defend on this case." (Emphasis added.)

During his opening, Penrod's counsel responded:

"I don't represent Petro–Drive, his employer. I don't represent this compensation carrier he talked about, okay. He can't bring them in this suit, okay, so they're not here this week. Petro–Drive is not a party to this litigation."

"What is going on with this compensation? Not my business. I'm not representing his compensation carrier. I'm here to defend Penrod."

During cross-examination of Dr. Dupuy, Penrod's counsel also asked questions pertaining to previous unemployment compensation payments to Fruge. He did not inquire about termination of benefits covered by the court's orders.

■ Argument by counsel that the plaintiff in a tort suit will receive workers' compensation is improper and prejudicial because it may adversely affect the jury's deliberations or violate the collateral source rule. *Doucet v. Gulf Oil Corp.,* 783 F.2d 518, 523 (5th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). However, a limited exception to the bar against mentioning compensation exists. "If there is little likelihood of prejudice and no strong potential for improper use, and a careful qualifying jury instruction is given, then receipt of compensation benefits may be admissible for the limited purpose of proving another matter." *Simmons v. Hoegh Lines,* 784 F.2d 1234, 1237 (5th Cir. 1986). In the typical case, improper mention of compensation affects a plaintiff who is already receiving or will receive compensation. Here, we have a plaintiff whose compensation had been terminated. As Penrod indicates, this may well elicit sympathy for the plaintiff, particularly when the argument of plaintiff's counsel fairly implies that the defendant was the party terminating the compensation.

■ The court limited the mention of compensation to a showing that termination was related to the onset of Fruge's psychotic condition. Although the transcript of the trial is incomplete, it does not appear that any qualifying instruction was requested or given after the subject was broached during opening arguments. Where evidence is admissible for one purpose but not another, the burden is on the objecting party to request a proper limiting instruction. *Savoie v. Otto Candies, Inc.,*

692 F.2d 363, 370 (5th Cir.1982); *see* FED.R. EVID. 105. Because no objection preserved this issue, it is waived. *See* FED.R.CIV.P. 51. Where the plaintiff opened the door to what he now asserts were objectionable statements, any error was harmless. *See* FED.R.CIV.P. 61.

■ Fruge argues that the trial court's ruling on the scope of admissibility of workers' compensation presented him with a "dilemma" over whether to make first mention of the issue, and thereby deflate its importance. We disagree. Fruge suffered from a psychotic condition which he attributed to Penrod's negligence and for which he sought damages. Experts were available to testify that this condition was, in part, created or exacerbated by the termination of compensation benefits. This mitigation of damage defense was an alternative to Penrod's denial of negligence. The trial judge properly allowed counsel for Penrod to address the issue to this extent. Fruge could request limiting instructions if the subject was broached. No dilemma was presented. Nothing in the court's ruling provoked his opening remarks. He simply made a tactical choice he now does not like.

### C.

■ Fruge last argues that the trial court improperly instructed the jury on Penrod's duty as vessel owner regarding injuries arising from hazards under its control. *See* 33 U.S.C. § 905(b). The court's instructions on the vessel owner's duties is set out in the margin.[2] This instruction follows *Scindia Steam Navigation Co.,*

*Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

Fruge acknowledges he did not object to this instruction. Therefore, his right to assign error is waived. FED.R.CIV.P. 51. He argues, however, that the instruction is plain error and results in manifest injustice. Plain error requires that plaintiff establish the challenged instruction was an incorrect statement of the law and was probably responsible for an incorrect verdict, leading to substantial injustice. *Rodrigue v. Dixilyn Corp.,* 620 F.2d 537, 541 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). "Where a jury is given an erroneous charge which will 'mislead the jury or leave the jury to speculate as to an essential point of law,' the error is sufficiently fundamental to warrant a new trial despite a party's failure to state a proper objection." *Pate v. Seaboard R.R., Inc.,* 819 F.2d 1074, 1083 (11th Cir.1987), (citing *Cruthirds v. RCI, Inc.,* 624 F.2d 632, 636 (5th Cir.1980)).

Fruge points to two cases subsequent to *Scindia* that carve out exceptions to its broad pronouncements of immunity on the part of the vessel owner. *See Masinter v. Tenneco Oil Co.,* 867 F.2d 892, 896–97 (5th Cir.1989); *Turner v. Costa Line Cargo Services, Inc.,* 744 F.2d 505, 512 (5th Cir. 1984) (Gee, J., dissenting). He points specifically to the omission of an exception permitting vessel owner liability "for injury caused by hazards under the control of the ship." Fruge asserts that improperly securing the shackle pin was an operational hazard under the control of Penrod's personnel. Without such instruction, he continues, the jury was left unadvised on the true state of the law.

---

**2.** "First, before any operations begin, the vessel operator must exercise care to make safe the portions of the vessel that it turns over to the person. In discharging this duty the vessel may rely on the person to perform his task with reasonable care. The vessel operator must also warn the person of hidden unsafe conditions on the vessel of which the vessel operator is, or should be aware.

"Second, once operations begin, the vessel operator has no general duty to supervise work or to inspect the area assigned to the person, unless custom, contract, or law imposes such a duty on the vessel operator. The vessel operator need not monitor the operations; rather the vessel operator is entitled to rely on the person's expertise and reasonableness.

"Third, the vessel operator has a duty to protect the person working aboard the vessel when two conditions are fulfilled. If the vessel operator becomes aware during the operations that the vessel or its gear poses a danger to the person working aboard the vessel, and if the vessel operator also learns that the person's employer is not acting to protect that person against danger, then the vessel operator acquires a duty to intervene and protect that person."

**1170**

In *Masinter*, it was clear that the vessel owner's crew was "solely responsible" for placing the stairway which caused the plaintiff to injure his ankle. We stated that "by remaining in control of the vessel, Marlin [the vessel owner] had a continuing duty of care to those aboard the vessel." *Masinter*, 867 F.2d at 897. While Penrod generally remained in control of the vessel here at issue, the device causing injury was not under its. control. The pin and shackle belonged to Petro–Drive, not Penrod. It was not Penrod's duty by contract or as vessel owner to insert the pin into the shackle. Because this exception could find no application under these facts, the district court was not required to instruct upon it. *See Neubauer v. City of McAllen, Tex.*, 766 F.2d 1567, 1575 (5th Cir.1985).

Furthermore, we expressly noted in *Masinter* that "§ 905(b) does not impose strict liability on vessel owners for injuries resulting from such hazards [under its control]. Rather, liability only arises if the vessel owner breached its duty of care." *Masinter*, 867 F.2d at 898. To include in the instructions the exception for which Fruge now argues would have placed before the jury the same two issues presented under the negligence charge: whether Penrod controlled placement of the pin, and, if so, whether it placed that pin improperly. The jury's verdict established a negative answer to one of these issues. Therefore, the jury was not misled or left to speculate upon an essential issue in this case. Because we cannot say that the result would have favored Fruge had the court recast the negligence issue in terms of vessel owner liability, the instructions given did not result in manifest injustice.

### III.

The judgment of the district court is AFFIRMED.