Earl K. PHILLIPS and Carrie Phillips,
Plaintiffs–Appellants,

v.

The WESTERN COMPANY OF
NORTH AMERICA, et al.,
Defendants–Appellees.

No. 90–4704.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1992.

Rehearing Denied March 9, 1992.

Daniel E. Broussard, Jr., Alexandria, La., for plaintiffs-appellants.

Habans & Bologna, Robert N. Habans, Jr., New Orleans, La., for defendants-appellees.

Before WISDOM, KING and JOLLY, Circuit Judges.

KING, Circuit Judge:

Plaintiff Earl Phillips reinjured his back while he and a co-employee connected a flow line to the bell nipple on the blow-out preventer (BOP) stack of the TRITON III, a jack-up drilling rig off the coast of Louisiana owned by defendant The Western Company of North America (Western). He asserted an unseaworthiness claim under general maritime law and a negligence claim under the Jones Act, 46 U.S.C.App. § 688, and his wife asserted a claim for loss of consortium under general maritime law. After the close of the plaintiff's case, the district court granted Western's motion for a directed verdict on the unseaworthiness claim, but denied the motion on the Jones Act claim. The jury returned a verdict in favor of Western.

On appeal, Phillips argues that the district court erred (1) in keeping the unseaworthiness claim from the jury, because the evidence was sufficient to raise a jury question about whether Western created an unsafe working environment; (2) in overruling his objection to Western's introduction of evidence concerning the post-accident benefits it paid him; and (3) in refusing to grant his motion for a new trial. We agree with Western that reasonable minds could not differ on the issue of the TRITON III's unseaworthiness, and therefore affirm the directed verdict on the unseaworthiness claim. However, we find that the district court erred in allowing Western to introduce evidence of the post-accident benefits without first determining whether they fell outside the bounds of the

collateral source rule. Although we disagree with Phillips's position that he has shown conclusively that the benefits derived from a collateral source, there is substantial uncertainty about the character of the benefits. If they were indeed collateral and subject to exclusion, their inclusion as part of the defendant's case—and the lack of a limiting instruction—raises the possibility that the jury improperly factored the evidence into its determination of liability. Phillips is therefore entitled to a new trial on the Jones Act claim.

## I. BACKGROUND

Phillips testified that he had worked in the oilfield since 1973 and had been a driller for Western since 1982. Following an injury he sustained to his lower back while working for a previous employer, he learned that he had spondylolisthesis, a congenital condition involving the absence of a bony connection in the spine. He declined at that time to have fusion surgery to correct the problem, as suggested by his doctor.

On September 21, 1986, he was supervising a crew of four on the TRITON III during a "nippling up" operation. This required the crew to connect a mud flow line to the bell nipple spout on the BOP stack.[1] The flow line had to be pushed close enough to the nipple that the air bladder coupling between the two could be sealed. Phillips and another employee lifted the flow line, which was partially suspended by chains, and attempted to "stab" it onto the bell nipple. They did not use an air hoist to provide additional support for the flow line because at the time of the operation other workers were running a gyro survey on the main drill floor.[2] Because the movement of the sea caused the BOP stack to rock slightly, they were unsuccessful in the first two attempts at stabbing the flow line. Phillips waited for the BOP stack and the bell nipple to stop moving and, on the third try, successfully stabbed the flow line. He testified that he felt a pain in his back on the third attempt to connect the flow line.

Phillips's expert, Kenneth Kaigler, a petroleum engineer with 40 years of experience in the oilfield, testified about the methods used on the TRITON III. On direct examination, Kaigler expressed his opinion that lifting the flow line manually to move it forward onto the bell nipple was an unsafe procedure, and that equipment such as a bell guide[3] attached to the flow line would have eased the connection of the flow line in the event the two pieces of pipe did not line up properly on the first try. He further suggested that the use of padeyes and bolts would aid in lifting the flow line and moving it toward the bell nipple, and indicated that use of a Dresser sleeve, a device developed long before the air bladder, would obviate the need to move the flow line toward the bell nipple. He testified that it would have been unsafe to use an air hoist while a gyro survey was being performed because of the danger of multiple lines running through the rotary in the drill floor.

On cross-examination, Kaigler testified that the air bladder connection in use on the TRITON III is a perfectly acceptable technology, even though it required workers to physically push the flow line toward the bell nipple. He indicated that an air hoist would have made it easier to align the flow line because less effort by the workers would have been necessary to move the flow line toward the nipple. Kaigler further testified that the end of the flow line on the TRITON III was designed like a Dresser sleeve in that it fit over the bell nipple with some clearance. Kaigler indicated that a Dresser sleeve may in fact be less safe than an air bladder coupling because the nature of the drilling mud that passes through the mud flow line leaves

---

1. In layman's terms, this essentially involved connecting two large pieces of pipe. One piece, the bell nipple, was attached to the BOP stack and was stationary, while the other piece, the flow line, had to be physically pushed toward the bell nipple, connected, and sealed.

2. A gyro survey is a survey of activity within the drilling hole.

3. A bell guide involves use of a flanged-out end on the flow line. The wider pipe end makes it easier to connect the flow line to the nipple.

the Dresser sleeve susceptible to corrosion, especially under the conditions in the marine environment. On redirect, Kaigler again stated that a Dresser sleeve "is just one of the ways that it could be done. The air bladder, there is nothing wrong with the air bladder, it is okay...." He indicated that the benefit of the Dresser sleeve over the flow line connection design on the TRITON III was the fact that less pipe is moved. He offered the opinion that any reduction or elimination of the need for workers to physically move pipe is a preferable work procedure in the oilfield.

Phillips testified that he had performed the stabbing operation numerous times and saw nothing unsafe about it. He was in charge of the operation, and could have used an air hoist or other equipment he felt was necessary to make the work safer. He did not use the air hoist because that would have involved waiting for completion of the gyro survey, and he testified that he wanted to keep the work on schedule so he could make the company money.

After the accident, Western began paying Phillips long-term disability benefits equal to two-thirds of his salary, as well as medical benefits and maintenance payments. Without objection by Phillips, Western introduced evidence of the medical benefits. Phillips objected, however, to introduction of evidence of the maintenance pay and the long-term disability benefits. Phillips lodged a written objection, arguing that maintenance pay may not be deducted from an award of past lost wages and that the disability benefits were immune from setoff under the collateral source rule. He renewed his objection to the maintenance pay and the disability benefits at trial. In a bench conference, Phillips's attorney reargued the points he had made in his written motion, contending that the disability benefits were fringe benefits and that such evidence may not be placed before the jury because of the possibility of prejudice. The judge overruled the objection, stating that "the income that the man received is in fact income, and that should be reflected so that he doesn't get a double recovery." Although, as the district judge noted, Western presumably introduced the evidence in order to obtain a setoff against any potential Jones Act liability, it never pleaded a right to setoff and did not make its purpose in introducing the evidence apparent to the district judge. Moreover, neither Western nor Phillips placed any evidence before the district judge prior to his ruling on the admissibility of the evidence that bore on the question whether the disability benefits fell within the legal definition of "collateral source income."

The precise source of the payments into the fund did not become clear at trial. Phillips initially expressed a belief that the program was totally funded by Western, but he then stated that he thought it was funded through deductions from his paycheck. Defense counsel, characterizing the payments as replacement of lost wages, referred to them several times in his closing statement while exhorting the jury to deny Phillips a double recovery. The jury returned a verdict in favor of Western on the negligence claim. Phillips filed a motion for a new trial and, in its opposition to the motion, Western appended an affidavit from its Vice President for Human Resources stating that the Western disability plans are non-contributory on the part of the employee. The district court denied the motion for a new trial, and this appeal followed.

## II. THE UNSEAWORTHINESS CLAIM

Phillips first argues that the district court erred in directing a verdict on the unseaworthiness claims at the close of his case. We review the decision to grant the motion under the same standard used by the district court, viewing the evidence and drawing all reasonable inferences in favor of the party opposing the motion. *Fruge v. Penrod Drilling Co.*, 918 F.2d 1163, 1166 (5th Cir.1990). The standard for a directed verdict mirrors that for summary judgment. The question for the court, in considering a motion for a directed verdict, is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). A directed verdict is justified only "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict...." *Bommarito v. Penrod Drilling Co.*, 929 F.2d 186, 189 (5th Cir.1991) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc)). In the context of unseaworthiness, a motion for a directed verdict may be granted only where reasonable minds could not differ on the question whether an unseaworthy condition of the vessel caused the plaintiff's injury. *Robinson v. Zapata Corp.*, 664 F.2d 45, 47 (5th Cir.1981).

 To sustain his burden of proving unseaworthiness, Phillips was required to show that Western provided a vessel (including its appurtenances, gear and equipment) that was not reasonably fit for its intended purpose. *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). This does not mean that Western was under a duty to provide a perfect, or accident-free vessel; rather, its duty extended to providing a vessel and equipment that was *reasonably* suited for the purposes of performing offshore drilling operations. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960); *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1433 (5th Cir.1988) (per curiam), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Because the duty to provide a seaworthy vessel is "absolute and completely independent of the duty under the Jones Act to exercise reasonable care," *Johnson*, 845 F.2d at 1354 (citing *Mitchell*, 362 U.S. at 549, 80 S.Ct. at 932), Phillips was not required to show that Western was negligent. However, he was required to meet a more demanding standard of proximate causation than is applicable to Jones Act claims. *Id.* His burden was to show that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably

probable consequence of the unseaworthiness." *Id.* (citations omitted).

We have not restricted unseaworthiness claims involving a vessel's equipment to the operation of the equipment itself, but have held that an unsafe method of work may also render a vessel unseaworthy. *Rogers v. Eagle Offshore Drilling Serv., Inc.*, 764 F.2d 300, 303 (5th Cir.1985). We indicated in *Rogers*, however, that evidence of the mere existence of alternative work procedures or the availability of alternative equipment was not enough to require the judge to instruct the jury on this theory of unseaworthiness. We found in *Rogers* that, where there was no evidence indicating that it was unsafe to manually unroll a drawworks drum during a drill line replacement operation, the vessel was not unseaworthy: "[c]learly a plaintiff must present sufficient evidence to raise a jury question whether a method of operation is unsafe, before a fully equipped vessel, with all its gear in good working order, can be rendered unseaworthy." *Id.* at 304.

 After reviewing the evidence in this case, we agree with the district court that it was insufficient to raise a jury question about unseaworthiness. Kaigler testified to alternative work procedures and alternative technologies, such as the Dresser sleeve, that could have been used to attach the flow line to the BOP stack. But he indicated on more than one occasion that there was nothing unsafe about using an air bladder to make the connection. He indicated that an air hoist could have reduced the level of exertion required of the crew in aligning the flow line, but the evidence showed that this procedure was available to Phillips and could have been used if Phillips so chose. Phillips, moreover, testified that he had performed this type of operation numerous times and saw nothing unsafe about it.

Kaigler's reservations about the procedure used on the TRITON III, expressed on direct examination, arose from his belief that requiring the workers to physically push the flow line toward the bell nipple placed the worker in a position in which he could injure his back. Kaigler was not,

however, qualified as a medical expert, and his opinion about the likelihood of lower back injury was insufficient by itself to create a jury question on the safety of the procedure. Moreover, Kaigler did not testify that any of the equipment used on the TRITON III to perform the flow line connecting operation was unsafe. His testimony could lead a reasonable juror only to the conclusion that there are *other* and perhaps *easier* methods of connecting a flow line, but this is insufficient to raise a question whether the method actually used on the TRITON III rendered the vessel unseaworthy.[4]

### III. THE JONES ACT CLAIM

■ Phillips's next point of error involves the Jones Act negligence claim, which was submitted to the jury and resolved in favor of Western. Phillips argues that the district court should not have allowed Western to introduce evidence of disability and other payments that Phillips received following the accident. He invokes the collateral source rule, which generally denies to a tortfeasor a reduction in its liability by any amounts the plaintiff receives from a source collateral to, or independent of, the tortfeasor. *Bourque v. Diamond M Drilling Corp.*, 623 F.2d 351, 354 (5th Cir.1980); *Haughton v. Blackships, Inc.*, 462 F.2d 788, 790 (5th Cir.1972); *A.H. Bull Steamship Co. v. Ligon*, 285 F.2d 936 (5th Cir.1960). The substantive rule of no reduction carries with it an evidentiary rule requiring the exclusion of evidence of any collateral benefits. Phillips argues that Western's eliciting of evidence of the benefits during his cross-examination, as well as Western's repeated references to the benefits in its closing argument, did exactly what the evidentiary component of the collateral source rule is supposed to prevent—it prejudiced the jury against finding Western negligent by making the jury think Phillips had already been adequately compensated for his loss.

### A. *Evidence of Maintenance Pay*

We can dispose of one of Phillips's objections without difficulty. We have held that maintenance pay may not be deducted from an award for past lost wages. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 378 (5th Cir.1989); *Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191, 1197 (5th Cir.1982). It may be deducted only from amounts awarded by the jury which are the substantial equivalent of maintenance. *Colburn*, 883 F.2d at 378; *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 404 (5th Cir.1979). The jury was given no instruction as to the use they could make of this evidence. Thus, its admission was error.

### B. *Evidence of Disability Benefits*

■ The evidence of disability benefits presents a considerably more difficult problem. The concern that juries will factor in evidence of collateral benefits when determining liability has historically been the leading reason for excluding such evidence. *See Eichel v. New York Central R. Co.*, 375 U.S. 253, 255, 84 S.Ct. 316, 317, 11 L.Ed.2d 307 (1963) (per curiam) ("In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence"); *Fruge*, 918 F.2d at 1168 ("Argument by counsel that the plaintiff in a tort suit will receive workers' compensation is improper and prejudicial because it may adversely affect the jury's deliberations...."); *Simmons v. Hoegh Lines*, 784 F.2d 1234, 1237 (5th Cir.1986) ("juries will be more likely to find no liability when they are aware that the plaintiff has already received compensation"); *Doucet v. Gulf Oil Corp.*, 783 F.2d 518, 523 (5th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986) ("even an argument by counsel that the plaintiff in a tort suit will receive worker's compensation is so prejudicial as to warrant a new trial").

■ It is undoubtedly true that knowledge that an injured plaintiff has resources available to compensate him for his loss, separate from the defendant, may divert

---

4. Because we affirm the directed verdict on the grounds that the evidence of unseaworthiness was insufficient to raise a jury question, we need not address Mrs. Phillips's claim for loss of consortium.

the jury's attention from its narrow task of determining whether the defendant was negligent. The jury may feel that awarding damages would overcompensate the plaintiff for his injury (even though the defendant would only pay once), and may factor this into the liability calculus. This concern compels us to reject Western's suggestion that, even if introduction of evidence of post-accident benefits was error, it had no effect on the jury's finding of no negligence and therefore constituted a form of harmless error. Although the evidence of negligence was slim,[5] our cases have deemed it to have so prejudicial an effect that we cannot be sure it did not play a role in the jury's deliberations on negligence. *See Simmons,* 784 F.2d at 1237.[6] Moreover, the trial judge gave no curative instruction that would indicate to the jury the use they could make of the evidence, *see id.* (erroneous admission of evidence of collateral benefits requires reversal unless curative instruction given), and Western's attorney repeatedly alluded to the benefits in his closing statement in an effort to bring the possibility of double recovery to the jury's attention. Under these circumstances, we cannot say that any potential error was harmless.

■■■■ In addition to the possibility of jury prejudice, there is another reason for excluding evidence of collateral benefits, one which perhaps is more consistent with the authority for exclusion found within the Federal Rules of Evidence: if the substantive law disallows a setoff from the tortfeasor's damages for the plaintiff's collateral benefits, evidence of collateral bene-

fits simply has no relevance in the lawsuit. Evidence that is not relevant, of course, is not admissible. Fed.R.Evid. 402. Several justifications have been advanced to support the substantive rule that a tortfeasor may not obtain a setoff: the plaintiff should not be penalized for having had the foresight to obtain insurance, particularly where, but for the tortfeasor's actions, that insurance would have continued to be available for other purposes; allowing the tortfeasor a credit for the plaintiff's insurance detracts from the function of deterrence in tort law; and the defendant deserves to pay for his fault. *See generally* Harper, James & Gray, *The Law of Torts* § 25.22 (2d ed. 1986). While this court has not explored the justifications for the collateral source rule in detail, it is plainly applicable in Jones Act negligence cases. *Tipton v. Socony Mobil Oil Co.,* 375 U.S. 34, 35, 84 S.Ct. 1, 2, 11 L.Ed.2d 4 (1963) (per curiam); *Bourque,* 623 F.2d at 354; *Haughton,* 462 F.2d at 790–91.

■■■■ In most cases, identifying income subject to the collateral source rule is not a difficult task. The rule's formulation—that the plaintiff's recovery is not subject to a setoff for benefits independent of the tortfeasor—leads to the straightforward conclusion that medical insurance,[7] disability insurance and other forms of protection purchased by the plaintiff, as well as gifts the plaintiff receives,[8] cannot reduce recovery. Moreover, workers' compensation, which is paid by an employer, may not diminish recovery when an injured worker sues the tortfeasor. *See Fruge,* 918 F.2d

---

5. The evidence that would have formed the basis for a finding of negligence was the same as the evidence that would have formed the basis for a finding of unseaworthiness. Although it is clear that the legal tests for establishing each are different, both causes of action may arise out of a common nucleus of facts. *Simeon v. T. Smith and Son, Inc.,* 852 F.2d 1421, 1433 (5th Cir.1988) (per curiam), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Brunner v. Maritime Overseas Corp.,* 779 F.2d 296, 298–99 (5th Cir.), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986).

6. The circumstances under which we have allowed evidence of collateral benefits are nar-

row. Not only must there be "little likelihood of prejudice and no strong potential for improper use," the trial judge must give a "careful qualifying jury instruction" and there must be a specific purpose (e.g. proof of some other matter) for the evidence. *Simmons,* 784 F.2d at 1237.

7. *E.g., Helfend v. Southern California Rapid Transit Dist.,* 2 Cal.3d 1, 84 Cal.Rptr. 173, 465 P.2d 61 (1970).

8. *E.g., Varlack v. SWC Carribean, Inc.,* 550 F.2d 171 (3d Cir.1977).

at 1168; *Bourque,* 623 F.2d at 354.[9] Because the tortfeasor has no connection with these types of benefits, they are easily identifiable "independent" sources of income.

In cases where the tortfeasor contributes toward the benefit, however, the justifications for denying a setoff become less compelling. The rule is intended to ensure that the availability of outside sources of income does not diminish the plaintiff's recovery, not make the tortfeasor pay twice. *Perry v. Larson,* 794 F.2d 279, 286 (7th Cir.1986); *Thomas v. Shelton,* 740 F.2d 478, 484–85 (7th Cir.1984). If one goal of the rule is to promote accident avoidance by ensuring that the tortfeasor pays for his faulty conduct, that goal is not marginally advanced if the tortfeasor both pays in advance for the plaintiff's benefit and pays now for the full measure of damages. Thus, we have recognized that it would be unfair to allow the plaintiff a double recovery when both the liability judgment and the collateral benefits are paid for by the defendant. *Smith v. Office of Personnel Management,* 778 F.2d 258, 263 (5th Cir. 1985), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1949, 90 L.Ed.2d 358 (1986); *Haughton,* 462 F.2d at 791. Because (to oversimplify) application of the rule of no setoff turns on whether the tortfeasor also paid for the plaintiff's "collateral" benefit, the "essence" of the rule has been described as the independence of the transaction giving rise to the collateral source. *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.,* 744 F.2d 935, 941 (2d Cir. 1984), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986).

Unfortunately, the rule articulated in *Smith v. Office of Personnel Management* is rarely clear-cut. In that case, we held that an age discrimination plaintiff's recovery against his government employer could be offset by the amount of government disability benefits he had received, because the defendant would have paid for both forms of recovery. *Id.* at 263. But this and other circuits have not narrowed the focus to the single question of the source of the benefits except in cases involving the government. In this context, the courts will apply the special defendant-as-tortfeasor exception to the collateral source rule only when it is clear that the government paid for the entire benefit. *Berg v. United States,* 806 F.2d 978, 984–85 & n. 4 (10th Cir.1986); *Titchnell v. United States,* 681 F.2d 165, 174–76 (3d Cir.1982).

In *Haughton,* we recognized that the inquiry into the collateral nature of benefits frequently is more subtle. We stated that "[a]pplication of the collateral source rule depends less upon the source of funds than upon the character of the benefits received." 462 F.2d at 790 (footnote omitted); *see also Burlington Northern R. Co. v. Strong,* 907 F.2d 707, 713 (7th Cir.1990); *Clark v. Burlington Northern, Inc.,* 726 F.2d 448, 450 (8th Cir.1984); *Folkestad v. Burlington Northern, Inc.,* 813 F.2d 1377, 1381 (9th Cir.1987); *Russo v. Matson Navigation Co.,* 486 F.2d 1018, 1020 (9th Cir. 1973); *Blake v. Delaware and Hudson Ry.,* 484 F.2d 204, 206 (2d Cir.1973); *Clark v. National R.R. Passenger Corp.,* 654 F.Supp. 376, 377 (D.D.C.1987); *Allen v.*

---

**9.** Because the injured worker normally cannot sue his employer in tort, workers' compensation benefits usually derive from a source collateral to the tortfeasor. *See, e.g.,* 33 U.S.C. § 905(a) (payment of compensation according to predetermined schedule is employer's sole liability to injured worker under Longshore and Harbor Workers Compensation Act). Although many workers' compensation statutes enable the employer to recover the amounts they pay by subrogating the employer to the worker's claim, *see* Harper, James & Gray, *The Law of Torts* § 25.22 at 653 n. 9 (2d ed. 1986), this does not reduce the total amount of damages paid by the tortfeasor. *See* 33 U.S.C. § 933 (LHWCA subrogation section). This scheme was explained in

*Stifle v. Marathon Petroleum Co.,* 876 F.2d 552 (7th Cir.1989), as follows:

> The employer is compelled to pay the benefits regardless of whether it was negligent or not. In return, the employer takes a lien for the total amount of benefits paid on any judgment or settlement the employee may later obtain. Accordingly, the injured employee is fully—but not doubly—compensated; the tortfeasor pays for the injuries for which it is responsible and the employer recovers so much of its workers' compensation payments as is attributable to the tortfeasor's negligence.

*Id.* at 560 (footnote omitted).

*Exxon Shipping Co.,* 639 F.Supp. 1545, 1547–48 (D.Me.1986); *Hall v. Minnesota Transfer R. Co.,* 322 F.Supp. 92, 95 (D.Minn.1971). In *Haughton,* we determined that the fact that an employer-tortfeasor contributed to a fund from which the benefits derived did not preclude a conclusion that the funds were to be treated as collateral. 462 F.2d at 790. We contrasted the payments made by the employer in *Haughton* with payments "characterized as a voluntary undertaking by the employer to indemnify itself against its possible legal liabilities for payment of maintenance and cure." *Id.* at 791. Finding that the employer's payments into a maritime retirement pension fund were *not* made for the purpose of responding to legal liability, we held that the pension benefits could not be set off against the plaintiff's damages. We indicated that payment by an employer into a fund for the purpose of providing a fringe benefit or deferred compensation would make the benefit subject to the collateral source rule, although we did not explicitly characterize the pension benefit in *Haughton* as such. *Id.*

*Haughton* requires us to ask whether a benefit paid for by the tortfeasor was intended to respond to potential future legal liability. As noted above, in most cases the employer that funds a disability benefit program such as workers' compensation cannot also be the tortfeasor because of statutory immunities. Liability under the Jones Act and the Federal Employers Liability Act, 45 U.S.C. § 51 *et seq.,* are two contexts in which the employer may both fund a benefit program *and* be subject to tort suit; not surprisingly, the bulk of the cases exploring the notion of benefits intended to respond to legal liability involve these statutes. Courts in FELA cases have adopted the same rule we expressed in *Haughton,* holding that the collateral source rule applies to fringe benefits or deferred compensation, but does not apply to "payments made by the employer in order to indemnify itself against liability . . . ." *Clark,* 654 F.Supp. at 377; *Lyons*

*v. Southern Pacific Transp. Co.,* 684 F.Supp. 909, 911 (W.D.La.1988).

In *Allen v. Exxon Shipping Co.,* 639 F.Supp. 1545 (D.Me.1986), the court listed five factors that may assist in distinguishing fringe benefits from benefits intended to respond to legal liability. These include

(1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action.

639 F.Supp. at 1548.[10] The disability plan at issue in *Allen* required no contribution of the employee, was not funded pursuant to a collective bargaining agreement, and specifically provided for a setoff in the event the employer was required to pay a judgment to the employee, three features that cut in favor of setoff. But other features cut in favor of disallowing setoff. The plan covered injuries arising from both work-related and nonwork-related injuries, and was to some extent dependent on the length of the employee's service with the company. *Id.* at 1548–49. The court found dispositive the fact that the plan was not established pursuant to a collective bargaining agreement and that the employer had specifically provided for setoff. The latter was evidence that the "payments made to this Plaintiff were made pursuant to a plan intended by the employer, as its dominant purpose, to provide for the employer's indemnification against liability." *Id.* at 1549.

Similarly, in *Clark v. Burlington Northern, Inc.,* 726 F.2d 448 (8th Cir.1984), the court, after pointing out the difficulty in distinguishing a fringe benefit from a bene-

---

**10.** The district court discussed this issue in the context of ruling on the plaintiff's motion *in limine* to exclude evidence of disability benefits and the defendant's motion for setoff. *See Allen,* 639 F.Supp. at 1546.

fit intended to indemnify an employer against future legal liability, focused on the fact that the disability plans at issue explicitly provided for a setoff of disability payments against FELA judgments. Setoff was appropriate because of the employer's "clear[ ] inten[t] to make a voluntary disability plan supplemental to sums recovered under the FELA...." *Id.* at 451. Although the *Clark* court ultimately relied on the employer's contractually expressed intent to indemnify itself against FELA liability, it agreed with the analysis *Allen* applied to the fact that the benefits responded to both work-related and nonwork-related injuries: "A persuasive argument can be made ... that the disability benefits were exempt from setoff as a fringe benefit because they were payable regardless of whether the disability resulted from a job-related injury." *Clark*, 726 F.2d at 451 (citing *Hall v. Minnesota Transfer R. Co.*, 322 F.Supp. 92, 96–97 (D.Minn.1971)).

■ We agree that the factors enumerated in *Allen* are relevant to the distinction between fringe benefits and benefits intended to respond to legal liability. In the case before us, however, no evidence as to any of these factors was presented to the district judge prior to his ruling on Phillips's objection to introduction of the evidence. The record before us is insufficient to enable us to determine whether the benefits were intended to respond to Western's legal liability under the Jones Act.

We do not know any better than the district judge whether the benefits were available for both work-related and nonwork-related injuries, whether Western had made clear any intention to set off payments against Jones Act liability, or the like. Phillips is entitled to a new trial in which these questions are considered before introduction of evidence of Western's benefit plan is introduced.[11]

■ We note that evidence of the structure of the Western plan should have been presented to the district judge before he ruled on whether the benefits fell within the collateral source rule. Phillips gave contradictory testimony at trial about the funding of the plan, but this question should not have been litigated before the jury. It is elemental that the judge, not the jury, is charged with determining in the first instance whether evidence is admissible; this responsibility applies to ascertaining whether particular benefits are subject to the collateral source rule. As we have already discussed, one of the purposes of the exclusionary rule that accompanies the rule of no setoff is to shield the jury from potentially prejudicial information about the plaintiff's outside sources of income. The judge must examine the plan and decide whether it is admissible.

■ Western's affidavit attached to its opposition to Phillips's motion for a new

---

**11.** The dissent suggests that, because there was *"no* evidence" of negligence, any trial error in the admission of evidence of collateral benefits was harmless and should not lead us to reverse the judgment. We disagree with the dissent's characterization of the record as containing no evidence of Jones Act negligence. Phillips's expert witness, Kenneth Kaigler, testified that in his opinion lifting the flow line manually to move it onto the bell nipple was an unsafe procedure. Although his statements on cross-examination may have detracted somewhat from this conclusion, the negligence standard in a Jones Act case is extremely low. We have consistently held that a defendant may be liable under the Jones Act for any negligence, however slight, that contributes to a plaintiff's injury, *e.g., In re Cooper/T. Smith*, 929 F.2d 1073, 1076–77 (5th Cir.) (per curiam), *cert. denied*, —— U.S. ——, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991); *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir.1984), and the district judge

determined that the jury should be the arbiter of the question of negligence.

Our conclusion that the introduction of evidence of collateral benefits constituted reversible error therefore depends on the fact that there was evidence in the record which could have led a jury, in the absence of the error, to find for Phillips. While we fully recognize that the trial error would have been harmless had there been *no* evidence to support Phillips's allegations of negligence (Judge Jolly's view of the case), our reading of the record does not support this conclusion.

Because the record does not enable us to say for sure whether the benefits Phillips received are subject to the collateral source rule, we do not consider Western's argument that evidence of the benefits was admissible under the exception we have recognized to the collateral source rule. *See Gates v. Shell Oil Co.*, 812 F.2d 1509, 1513 (5th Cir.1987).

trial, stating that the plan under which Phillips received benefits was non-contributory on the part of the employee, does not lead us to conclude that the benefits fell outside the purview of the rule. Western presented neither this affidavit nor any other information bearing on the plan to the district judge before introducing the evidence; indeed, it never indicated the purpose for which it introduced the evidence. Even if the district judge thought the evidence was properly admissible, he did not instruct the jury to use it only for the purpose of calculating a setoff. Given Western's attorney's clear references in his closing argument to the injustice of granting Phillips a double recovery, the jury at the very least should have been instructed not to use evidence of the benefits as substantive proof of Western's lack of negligence.

We do not mean to imply that evidence of Western's payment of disability benefits to Phillips could under no circumstances be introduced at trial. Phillips testified that the Western disability plan replaced his lost wages at a level of two-thirds his previous salary, and it is apparent that the plan replaces the very wages for which Western could be held liable under the Jones Act. Thus, the district court, after considering the relevant factors, may determine that this evidence is admissible subject to a limiting instruction.

Finally, we note that it is quite unnecessary in cases where the defendant is entitled to a setoff to introduce evidence of benefits that already have been paid. At issue in *Allen* was whether the defendant was entitled to a setoff, or whether the plaintiff could avoid introduction of evidence of the defendant's short-term and long-term disability payments. The court first found that the defendant was entitled to a setoff for the amounts paid under both benefit plans because they represented an intent to indemnify against future liabilities. 639 F.Supp. at 1549. But having found this, the court did not automatically allow the defendant to introduce evidence of the benefits: because the short-term benefits had already been paid in full, the court stated that it would perform the set-

off itself by subtracting from the jury's verdict. *Id.* There simply was no need to place this information before the jury, and the defendant's right to setoff could be realized without injecting potentially prejudicial information into the trial. The court did, however, allow the evidence of the long-term benefits to go to the jury, reasoning that

> Plaintiff's ultimate recovery by way of verdict is subject to reduction for *the value of the right* to receive such benefits in the future. Because the value of that right is dependent in part upon a factual determination as to how long plaintiff is likely to receive them, the Court is not in a position to make such a deduction in a manner consistent with the factual determinations that will be made by the jury in arriving at a verdict in favor of the Plaintiff....

*Id.* at 1550 (emphasis in original).

 This strikes us as an eminently sensible way of handling evidence of benefits that do not fall within the prohibition of the collateral source rule. Because at bottom we are dealing with substantive rights concerning setoff, there is no reason to risk jury prejudice when it is unnecessary for the jury to perform the setoff calculation. The court in *Allen* identified a purpose for jury consideration of evidence of future benefits, but we agree that evidence of past payments should be excluded and set off after the verdict. The district judge did not consider proceeding in this fashion with respect to the past and future benefits paid by Western to Phillips, but such a procedure would place before the jury only that evidence that is relevant to their task. A similar procedure may be used with respect to evidence of maintenance pay. Because it may be deducted only to the extent the jury awards the substantial equivalent of maintenance pay, the judge should instruct the jury on loss of earnings and then deduct or add maintenance pay after the jury returns its verdict.

## IV. CONCLUSION

We conclude that the court did not err in granting Western's motion for a directed

verdict on the unseaworthiness claim, because the evidence was insufficient to raise a jury question about whether Western provided Phillips with a safe place to work. On the Jones Act claim, however, we find that the district court did not properly ascertain whether disability benefits paid to Phillips were subject to the collateral source rule before allowing their introduction in evidence. Moreover, the district court should not have admitted evidence of maintenance pay. Phillips is entitled to a new trial on the Jones Act claim with evidentiary rulings in accordance with this opinion.

AFFIRMED in part, REVERSED in part and REMANDED for a new trial.

E. GRADY JOLLY, Circuit Judge, dissenting:

With all due respect for its able opinion, I do not understand how the majority can read the record in this case to justify a reversal.

The bottom line in this case is that there is simply *no* evidence to support Phillips's Jones Act claim. Before the issue of collateral source payments even becomes relevant, there must be evidence that will support a finding of Jones Act negligence. The majority states that Phillips's expert witness, Kenneth Kaigler, "[a]lthough his statements on cross-examination may have detracted somewhat from [his] conclusion," provided at least some evidence of negligence—enough, at least, to meet the "extremely low" Jones Act negligence standard. Kaigler's statements on cross-examination did more than "detract[ ] from [his] conclusion." "On cross-examination, Kaigler testified that the air bladder connection ... *is a perfectly acceptable technology*.... Kaigler indicated that a Dresser sleeve [the alternative he proposed on direct as minimizing the need for workers to move pipe] *may in fact be less safe*." (Emphasis mine). Majority opinion at 926–27.

The majority is correct that the standard for an unseaworthiness claim differs from the standard governing negligence in a Jones Act claim. The fact remains, however, that in confirming the directed verdict on the unseaworthiness claim, the court commented that Kaigler's "opinion ... was insufficient by itself to create a jury question on the safety of the procedure. Moreover, Kaigler did not testify that any of the equipment used ... to perform the flow line connecting operation was unsafe. His testimony could lead a reasonable juror only to the conclusion that there are *other* and perhaps *easier* methods of connecting a flow line." (Emphasis in original). Majority opinion at 928–29. It is, therefore, clear that a jury verdict in Phillips's favor could have been based only on the conjecture that *perhaps* some other method *may* have been *easier* and about as safe. This would not meet even the slight Jones Act negligence standard.[1] To be sure, it is not clear at all that this question should have even been submitted to the jury. *See Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) ("A mere scintilla of evidence is insufficient to present a question for the jury."). Under these circumstances, no reasonable jury could have returned a verdict for the plaintiff, irrespective of trial errors.

For these reasons, I would affirm the jury verdict in this case. I therefore respectfully dissent.

---

1. "Under the Jones Act, the plaintiff may recover if the facts show that negligence played any part, even the slightest, in producing the injury or death for which damages are sought." SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5–6.