**William REED, Plaintiff,**

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, Defendant.**

**No. CIV.A. 2:99CV–0081.**

United States District Court, S.D. West Virginia, Charleston Division.

Jan. 31, 2000.

---

Stuart Calwell & John Skaggs, Calwell & McCormick, Charleston, WV, for plaintiff.

H. Dill Battle, III, Niall A. Paul, Paula Dorst Gillis, Spilman Thomas & Battle, Charleston, WV, for defendant.

### MEMORANDUM OPINION & ORDER

HALLANAN, Senior District Judge.

Currently pending before the Court is Plaintiff's Memorandum in Support of Mo-

tion to Exclude Evidence of Disability Payments, or in the alternative to Certify a Question to the West Virginia Supreme Court of Appeals. Defendant has filed a brief in opposition to Plaintiff's Motion and opposes the requested certification to the West Virginia Supreme Court as well. Plaintiff has also filed a Reply to Defendant's Response.

### INTRODUCTION

Plaintiff argues in his motion that DuPont should not be allowed to present evidence of the existence and amount of his disability payments received from DuPont. Plaintiff asserts that such amounts are inadmissible because they are not amounts received or receivable pursuant to West Virginia's deliberate intent statute, West Virginia Code § 23–4–2. Plaintiff further contends that the amounts received by Plaintiff are part of a general employment policy of Defendant available to every employee, and therefore, are in the nature of consideration for his time spent at work. Finally, Plaintiff states that this issue of law appears to be a case of first impression, with no controlling authority from the West Virginia Supreme Court of Appeals. Therefore, Plaintiff requests the Court, in the alternative, to certify the following question to the Supreme Court of Appeals:

> Whether the term "amount received or receivable" as used in West Virginia code § 23–4–2 regarding the recovery of damages in a deliberate intention claim includes benefits paid by a defendant pursuant to an employer provided disability plan, which may be based on nonoccupational or occupational diseases or injuries, and provides for a reduction in benefits for social security disability and workers' compensation benefits, if any are received by the beneficiary.[1]

DuPont, however, advances that it is entitled to an offset for the benefits it is presently paying Plaintiff for the same injuries he claims in his lawsuit. Further, DuPont argues that guiding principles of common law remedies are adequate for the Court to determine the question presented in Plaintiff's Motion, and therefore, the issue need not be certified to the West Virginia Supreme Court of Appeals. Having reviewed said motions, as well as all memoranda and supplemental memoranda, both in support and opposition, as well as all relevant case law, the Court is now prepared to issue its ruling.

### FACTS

#### I. Background

Plaintiff, William Reed was employed as a production operator at a plant operated by Defendant, E.I. Du Pont De Nemours ("DuPont") near Belle, West Virginia, beginning in 1980 and continuing through May, 1998. Mr. Reed worked at DuPont in a variety of positions until February 6, 1997, when he was exposed to butylisocyanate ("BI") in the benlate benomyl process unit. Mr. Reed states that he entered the enclosed area to perform a job task and as a result of the exposure to said leak, he became sensitized to isocyanide containing products.

Plaintiff asserts that DuPont has warning systems placed throughout its plant to notify employees when a hazardous leek occurs. Plaintiff believes, however, that although DuPont knew of the hazards associated with sensitization to BI, it failed to provide an adequate warning system to advise of such leaks similar to the one Mr. Reed was exposed to, and further, no such warning was made in Mr. Reed's case. Plaintiff sought medical attention from the plant's medical department the day of the incident. Plaintiff states that he complained to plant doctors of increasing shortness of breath and coughing episodes. He returned to work the next day.

---

**1.** Plaintiff states that this issue is significant, because the amount of the benefits could equal his lost wages claim. The Plaintiff's expert economist testified that the calculation of the Plaintiff's lost wages would be affected by the determination of this issue.

In May of 1998, approximately one year after his exposure to BI, DuPont states that it was informed by Plaintiff that he was diagnosed with reactive airway disease. As a result of the diagnosis, DuPont asserts that in the spring of 1998, Plaintiff informed the plant medical department that his physician had told him he could only work in areas where he was assured he would never be exposed to any chemicals, especially BI. As a result of this restriction, DuPont states that it determined that it did not have any work he could perform at the Belle Plant. In March of 1998, prior to DuPont's notice of Plaintiff's restriction, Mr. Reed had surgery for a hernia that developed from an incision that was created as a result of a colostomy performed on him in May of 1997. Plaintiff alleges that as a result of his coughing episodes from the exposure to BI he suffered a ruptured colon. DuPont, however, denies Plaintiff's disability is in any way occupationally related.

Plaintiff began a six-month short-term disability leave on May 29, 1998, and did not return to the Belle Plant for work. Plaintiff subsequently retired from DuPont on December 31, 1998, with an Incapability Retirement Pension under DuPont's Pension and Retirement Plan ("Incapability Pension") and benefits under DuPont's Total and Permanent Disability Income Plan ("T & P Plan"). Plaintiff filed a claim for Workers' Compensation benefits on September 24, 1998, which was ultimately granted. DuPont, however, has appealed that decision to the West Virginia Workers' Compensation Appeal Board, where it is presently pending. Plaintiff concurrently filed for Social Security disability benefits, which was denied initially, however, that claim is pending on review before the Social Security Office.

As a result of the alleged injuries Plaintiff suffered from the exposure to BI, Plaintiff has filed a claim under West Virginia Code § 23–4–2(c)(2)(ii), West Virginia's deliberate intent statute. Plaintiff seeks damages for lost earnings, medical expenses, pain and suffering, mental anguish, impairment of physical activities and the ability to engage in day to day activities, impairment of his ability to work and utilize his past job skills, and loss of worker's compensation benefits, disability benefits, and medical and insurance benefits.

### *DUPONT'S POLICY PLANS*

## II. Description of DuPont's Benefit Plans

### A. Pension Plan

DuPont provides its employees with a Pension Plan. The Pension Plan is funded by contributions made by DuPont to the Pension Trust Fund. *Def.'s Mot. Exclude Evidence of Disability Payments*, Ex A p. 25. Employees make no monetary payments to receive this benefit. *Id.* All that is required, according to the policy, is that the employee complete a certain number of years of employment with DuPont. *Id.* at 17. Pension Benefits are paid solely by DuPont from the Pension Trust Fund except as otherwise required by law. *Id.* at 25. According to Defendant, Plaintiff does not, and did contribute to the Pension and Retirement Plan.

Plaintiff is receiving an Incapability Pension under DuPont's Pension Plan because it was determined that he was permanently incapable of performing his duties. Like many pension plans, DuPont's Pension Plan is to provide for the retirement of employees. Ex. B at 4. To be eligible for the Incapability retirement, "an employee must be permanently incapable of performing the duties of his position with the degree of efficiency required by the Company, and he has at least 15 years of service." *Id.* at 7. "The amount of monthly pension payable to an employee eligible for retirement under this paragraph [is] determined in the same manner as a Normal Retirement pension." *Id.* In addition, any employee receiving an Incapability Retirement Pension also receives a supplement equal to the greater of:

(a) 50% of Primary Social Security Benefit, or

(b) $90 a month, such amount to be paid until the employee becomes eligible for old-age benefits under Social Security or receives a disability benefit under Social Security.

*Id.*

### B. Total and Permanent Disability Plan ("T & P Plan")

DuPont also provides its employees with benefits under the T & P Plan. According to DuPont's benefits manual, the T & P Plan was designed to be "[c]onsistent with DuPont's concern for its employees, . . . to provide financial protection if you become disabled while you are employed by the Company." Ex C at 2. DuPont's Short–Term Disability Plan provides full pay for up to six months if the a claimant suffers a disability that is not job related. *Id.* This benefit is paid entirely by DuPont. *Id.* Likewise, DuPont's T & P Plan is fully subsidized by contributions made by DuPont. *Id.* DuPont's T & P Plan covers occupational and non-occupational disabilities. *Id.* Benefits continue for life as long as the claimant remains totally and permanently disabled. *Id.* The Plan guarantees the claimant sixty-percent of their normal monthly pay when "combined with income from [federal or state government benefits or other DuPont] sources." *Id.* The rate of pay includes scheduled overtime, applicable premiums for shifts, Sundays and holidays, but does not include temporary variations in working hours, awards under special compensation plans, or payment for relocation or termination allowance. *See Id.*

### 1. Dental, Medical and Life Insurance Coverage Under the T & P Plan

The T & P Plan also covers an employee's dental, medical and life insurance. *See* Ex A at 8. As long as an employee receives benefits under the T & P Plan, life insurance paid by DuPont remains in effect. *Id.* In addition, an employee may purchase additional life insurance at reduced rates if that employee retires with fifteen years of service and receives an Incapability Pension. *Id.*

### III. DuPont's Current Payments to Plaintiff Under its Benefit Plans

Defendant's brief clearly sets forth the manner in which DuPont's Benefit Plan works as related to Plaintiff. Reiterating Defendant's financial breakdown of Plaintiff's current benefits, and as stated above, Plaintiff receives an Incapability Pension and T & P Plan benefits in amounts set forth in more detail herein, regardless of whether his disability is occupational or non-occupational. In addition, because Plaintiff completed more than fifteen years of employment, he is entitled to, and in fact receives medical, dental and life insurance coverage for the remainder of his life.

Currently, Plaintiff receives monthly benefits from DuPont under the Incapability Pension. According to Defendant, and not disputed by Plaintiff, the amount of the monthly Incapability Retirement Pension is $1121 with an additional supplement of $377. *Def.'s Mot. Exclude Evidence of Disability Payments,* p. 5. Therefore, in total, Plaintiff is receiving $1498 per month under DuPont's company funded Pension Plan. Under the terms of the Plan, Plaintiff will continue receiving this monthly benefit for the remainder of his life.

Defendant states that Plaintiff is also currently receiving monthly benefits under DuPont's T & P Plan. The T & P Plan provides benefits to the extent the employee's benefits from other sources do not equal sixty-percent of the employee's normal monthly salary. Ex C at 2. The other benefits used in this sixty-percent calculation are: Social Security benefits, DuPont Pension benefits, DuPont Incapability Supplement benefits, Workers' Compensation benefits, unemployment compensation and retirement, disability, and discharge or dismissal benefits from any foreign government. *Id.*

According to Defendant, Plaintiff's normal monthly salary was $4178; thus, the sixty-percent target is $2507. Plaintiff states that he is receiving $1498 from DuPont's Incapability Retirement Pension and Incapability Supplement. Therefore, according to the T & P Plan, Plaintiff could be entitled to $1009 allocated from said Plan. Defendant contends that if Plaintiff receives an award of Social Security disability in the future which is equal to or greater than $1009, he will not receive any T & P benefits. Likewise, an award from Workers' Compensation in an amount equal to or greater than $1009 would stop any T & P benefits.

## ANALYSIS

### IV. Common Law Claim

■ As stated above, Defendant asserts that it is entitled to an offset for the amount of disability pension paid to Plaintiff pursuant to West Virginia's deliberate intent statute, West Virginia Code § 23–4–2(b). This statute provides:

If injury or death result to any employee from the deliberate intention of his or her employer to produce such injury or death, the employee ... has a cause of action against the employer, as if this chapter had not been enacted, for any excess of damages over the amount received or receivable under this chapter.

Generally, "[t]he West Virginia Workers' Compensation Act gives covered employers a general immunity from employee suits for 'damages at common law or by statute' resulting from work-related injuries." *Arthur v. E.I. Dupont de Nemours & Co.*, 58 F.3d 121, 123 (4th Cir.1995); *Handley v. Union Carbide Corp.*, 804 F.2d 265, 269 (4th Cir.1986); *Thomas v. Kroger*, 583 F.Supp. 1031 n. 10 (S.D.W.Va.1984); W.Va Code § 23–2–6. However, in 1978, the West Virginia Supreme Court of Appeals issued a ground breaking decision in *Mandolidis v. Elkins Industries*, 161 W.Va. 695, 246 S.E.2d 907 (1978). In *Mandolidis*, the Court held that deliberate

intention "must be held to mean that an employer loses immunity from common law actions where such employer's conduct constitutes an intentional tort or willful, wanton, and reckless misconduct." *Mandolidis*, 161 W.Va. at 706, 246 S.E.2d 907.

■ The legislature's intent behind this statute was in part to remove from the common law tort system "all disputes between or among employers and employees regarding the compensation to be received for injury or death to an employee ...." W.Va Code § 23–4–2(c)(1). The legislature determined that the workers' compensation system needed protection from common law suits so as to protect those immunized from litigation outside the workers' compensation system. `Id.` In enacting the immunity provisions, the legislature intended to create a legislative standard, except as expressly provided in the statute, for the loss of that immunity of a more narrow application and containing more specific mandatory elements than the common law tort system concept, and standard of willful, wanton, and reckless misconduct. *Id.* Therefore, the immunity granted by this statute may be lost only if the employer or person against whom liability is asserted acted with "deliberate intention." *Mandolidis*, at 706, 246 S.E.2d 907; W.Va.Code § 23–4–2. Plaintiff's Complaint asserts that Defendant acted with deliberate intention, therefore, the case falls under the common law guidelines set forth in West Virginia's deliberate intent statute, W.Va.Code § 23–4–2.

### VI. Collateral Source Rule

■ Defendant contends that since Plaintiff's claim is governed by general common law tort principles, it is entitled to an offset for payments it has already made to Plaintiff for the same injuries claimed in the current lawsuit. However, Plaintiff argues that the payments made to him are from sources collateral to DuPont's payments and therefore, should not be considered in any damage recovery by Plaintiff.

Defendant, on the other hand, argues that the Incapability Pension and T & P Plan benefits paid to Plaintiff are not from a collateral source, but paid to Plaintiff directly from DuPont. *See* Ex A p. 25. Defendant states that Plaintiff does not and did not contribute to the two plans from which he is now receiving benefits.

The collateral source rule has long been a mainstay of American tort law since at least 1854. *See The Monticello v. Mollison*, 58 U.S. (17 How.) 152, 15 L.Ed. 68 (1854). "The collateral source rule was established to prevent the defendant from taking advantage of payments received by the plaintiff as a result of his own contractual arrangements entirely independent of the defendant." *Ratlief v. Yokum*, 167 W.Va. 779, 787, 280 S.E.2d 584 (1981); *Johnson v. Gen. Motors Corp.*, 190 W.Va. 236, 244, 438 S.E.2d 28 (1993). The collateral source rule provides that "if an injured person receives compensation for his injuries from a source wholly independent (collateral) of the tort-feasor, the payment should not be deducted from the damages which he would otherwise collect from the tort-feasor." Black's Law Dictionary 181 (6th ed.1991). Part of the rationale behind this rule is that either party is going to receive a windfall. *Olivas v. United States*, 506 F.2d 1158, 1163 (9th Cir.1974). The *Olivas* court went on to state:

> [I]f a part of the pecuniary loss is paid for by an outside source [then] it is more just that the windfall should inure to the benefit of the injured party than that it should accrue to the tort feasor. This conclusion seems to be based on substantial justice.

*Id.* The West Virginia Supreme Court of Appeals has held that part of the rationale behind the collateral source rule "is that the party at fault should not be able to minimize his damages by offsetting payments received by the injured party through is own independent arrangements." *Ratlief,* 167 W.Va. at 787, 280 S.E.2d 584.

Evidence of collateral source payments could lead to a substantial problem should the jury learn of them. There is a concern that juries will factor in evidence of collateral payments when determining liability and therefore, have historically been the leading reason for excluding such evidence. *Phillips v. Western Co. of N. Am.,* 953 F.2d 923, 929 (5th Cir.1992); *see Eichel v. New York Cent. R.R. Co.,* 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963) (per curiam) (finding that the "likelihood of misuse by the jury clearly outweighs the value of this evidence"). According to *Phillips:*

> It is undoubtedly true that knowledge that an injured plaintiff may have resources available to him separate from defendant, may divert the jury's attention from its narrow task of determining whether the defendant was negligent. The jury may feel that awarding damages would overcompensate the plaintiff for his injury (even though the defendant would only pay once), and may factor this into the liability calculus.

*Phillips,* 953 F.2d at 929–30.

■ There is another reason to exclude evidence of collateral benefits and that reason falls within the Federal Rules of Evidence. "[I]f the substantive law disallows a setoff from the tort-feasor's damages for the plaintiff's collateral benefits, evidence of collateral benefits simply has no relevance in the lawsuit." *Phillips,* at 930. Evidence that is not relevant is not admissible. Fed.R.Evid. 402.

In most cases, identifying income subject to the collateral source rule is not a difficult task. Courts generally follow the rule that the "plaintiff's recovery is not subject to a setoff for benefits independent of the tort feasor—leads to the straight forward conclusion that medical insurance, disability insurance and other forms of protection purchased by the plaintiff, as well as gifts the plaintiff receives, [or benefits characterized as fringe benefits],[2] can not reduce recovery." *Phillips,* at 930.

**2.** *Ruberto v. Maritrans Operating Partners,*

1993 WL 316754 (E.D.Pa.1993); *Hall v.*

This general rule is not so straightforward, however, when funds from a collateral source are paid directly by the tortfeasor for the plaintiff's benefit. Generally, courts have held that when an injured employee is receiving payments from the employer-tortfeasor's benefit fund, and that the injured employee has not contributed to said fund, then that employee is not entitled to offset those payments against the potential damages award. *Olivas,* 506 F.2d at 1163 (holding that the rationale behind the collateral source rule does not apply in a situation where the collateral source is the defendant himself); *Perry v. Larson,* 794 F.2d 279, 285 (7th Cir.1986) (allowing setoff where plaintiff's payments were collateral to that of defendant); *Phillips,* at 932 (finding that in cases where the tort-feasor contributes toward the benefit, the justifications for denying setoff becomes less compelling); *Equal Employment Opportunity Comm'n v. Enterprise Ass'n Steamfitters Local No. 638 of U.A.,* 542 F.2d 579 (2nd Cir.1976) (if the collateral source is wholly derived from the contributions of the employer, offset for payments from the fund will be required); *Ruberto v. Maritrans Operating Partners,* 1993 WL 316754 (E.D.Pa.1993) (holding that an employer may offset payments pursuant to a benefit plan implemented to provide for its own indemnification and not as a fringe employee benefit); 22 Am.Jur.2d Damages § 557 (1998) ("[p]ayments made by defendant to or for the benefit of the plaintiff reduce the recoverable damages"); *see Gypsum Carrier v. Handelsman,* 307 F.2d 525 (9th Cir. 1962); *United States v. Hayashi,* 282 F.2d 599 (9th Cir.1960); *Hawley v. Dresser Indus.,* 958 F.2d 720 (6th Cir.1992); *see also Powroznik v. C. & W. Coal Co.,* 191 W.Va. 293, 445 S.E.2d 234 (1994) (finding that Workers' Compensation benefits must be offset in a deliberate intent suit); *Ratlief,* at 787, 280 S.E.2d 584 (rational discussed above). Thus, "it would be unfair to allow

*Minnesota Transfer Ry. Co.,* 322 F.Supp. 92 (D.Minn.1971).

the plaintiff a double recovery when both the liability judgment and the collateral benefits are paid for by the defendant." *Phillips,* at 930; *Smith v. Office of Personnel Management,* 778 F.2d 258, 263 (5th Cir.1995) *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1949, 90 L.Ed.2d 358 (1986).

█ It appears that the overwhelming legal authority supports the conclusion that a tort-feasor is entitled to a setoff when the benefits an injured party receives are from a fund wholly derived from the contributions of the employer. That is the case here. Plaintiff is receiving $1121 with a supplement of $377 monthly from DuPont's Incapability Retirement Pension. DuPont is the sole contributor to its Pension Trust Fund and makes those contributions "necessary in order to meet the current and actuarially projected obligations of the plan." Ex A p. 25. Additionally, "[p]ension benefits described in the Pension and Retirement Plan are paid *solely* from the Pension Trust Fund . . . ." *Id.* (emphasis added).

Likewise, DuPont's T & P Plan is "paid entirely" by DuPont. Ex C p. 7. Plaintiff has not made any contributions to this plan.[3] The T & P Plan provides benefits to the extent that Plaintiff's benefits from other sources do not equal sixty-percent of Plaintiff's normal monthly salary. Currently, Plaintiff is not receiving either Workers' Compensation or Social Security benefits, therefore, the T & P Plan is compensating for the remainder of the monthly payments up to sixty-percent of Plaintiff's former monthly salary. In addition, these retirement and disability payments are entirely separate from any statutory duty imposed upon DuPont as a potential tort-feasor to pay Plaintiff for any particular injuries resulting from any alleged negligence that DuPont may have committed. Under the structure of these Plans, DuPont is the sole contributor, therefore, it should get the credit for the

**3.** DuPont's Short–Term Disability Plan is also entirely funded by DuPont. Ex C p. 7.

payments it has made under its own policy. To allow Plaintiff to set off these disbursements would penalize DuPont twice for the same item of damages.

## VII. Fringe Benefit

■ Plaintiff, however, argues that "the fact that [this compensation] comes from the defendant does not itself preclude the possibility that it is from a collateral source." *Price*, 288 F.2d at 450. In fact many courts have held that the collateral source rule depends less upon the source of the funds than upon the character of the benefits received. *Price, supra,* (finding that the fact that a benefit comes from the defendant tort-feasor does not itself preclude the possibility that it is from a collateral source); *Haughton v. Blackships, Inc.,* 462 F.2d 788, 790 (5th Cir.1972) (holding that the fact that an employer tortfeasor contributed to a fund from which the benefits derived did not preclude a conclusion that the funds were to be treated as collateral); *Hall v. Minnesota Transfer Ry. Co.,* 322 F.Supp. 92 (D.Minn. 1971) (offset depends on the character of the funds, not necessarily where they come from).

Plaintiff does not dispute that DuPont itself was the ultimate source of the funding for Plaintiff's disability benefits. However, he contends that fact alone is not dispositive on the issue of whether such benefits are from a collateral source. Several federal courts have considered this issue and have looked to a number of factors when deciding whether such benefits should be deemed fringe benefits that defendant is not entitled to a deduction in damages.

In *Phillips*, the Fifth Circuit discussed *Allen v. Exxon Shipping Co.,* 639 F.Supp. 1545 (D.Me.1986) and the five factors that may assist in distinguishing fringe benefits from benefits intended to respond to legal liability. These factors are:

(1) whether the employee makes any contribution to funding of the disability payment; (2) whether the benefit plan arises as the result of a collective bargaining agreement; (3) whether the plan and payments thereunder cover both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action.

*Phillips,* at 931 *quoting Allen,* 639 F.Supp. at 1548; *see Ruberto v. Maritrans Operating Partners,* 1993 WL 316754 *1; *Hall,* 322 F.Supp. at 96. In analyzing *Allen,* the Fifth Circuit held that the disability plan did not require payments by the employees, nor was the plan created as a result of a collective bargaining agreement. Further, the plan contained specific language contemplating a setoff for benefits received under the plan against a judgment in a tort action. The *Allen* court found these to factor in favor of a setoff for defendant, but the remaining factors to cut in favor of labeling the plan a fringe benefit. For example, the plan covered work and non-work related injuries, and was to some extent dependent upon the length of the employee's service. *Allen,* at 1548–49. However, the court found dispositive the fact that the plan was not established pursuant to a collective bargaining agreement and that the employer had specifically provided for setoff. "The latter was evidence that the 'payments made to this Plaintiff were made pursuant to a plan intended by the employer, as its dominant purpose to provide for the employer's indemnification against liability."' *Phillips,* at 932 *quoting Allen,* at 1549. It was obvious to the court the benefit plan in *Allen* was not a fringe benefit.

There is a case on point with the facts at hand that applies the five factors in *Allen.* In *Ruberto v. Maritrans Operating Partners,* Plaintiff was a seaman who was injured in an accident on one of defendant's oil barges. Plaintiff brought an action against defendant for damages. Defendant asserted that any damage awarded in

favor of plaintiff should be offset by the amount of short-term and long-term disability payments which plaintiff had received or will receive in the future. Plaintiff had received $20,646, in short-term disability benefits from defendant and was also receiving $967.36, monthly in the form of long-term disability benefits. The court stated that "[a]n employer may offset payments pursuant to a benefit plan implemented to provide for its own indemnification and not as a fringe employee benefit". *Ruberto*, 1993 WL 316754, *1. In determining whether the benefits supplied by defendant were fringe in nature, the court applied the five factor test set out in *Allen*.

The Court found it undisputed that defendant's disability plan and policy were solely employer funded and did not arise as a result of collective bargaining activity. *Id.* Further it was also undisputed that the plan covered both work and non-work related injuries, and that payments were contingent on the length of service. *Id.* Defendant's plan provided that:

> Payments by the Company to eligible employees will be offset by any Workers' Compensation, state and/or federal disability, or other similar payments .... The long-term disability plan procured by defendant provided that any payments would be offset pursuant to a proportional formula by 'other income benefits' which included social security benefits and are otherwise defined in relevant part as [t]he amount of benefits to which [the employee] was entitled under any:
> (a) workers' compensation law;
> (b) occupational disease law;
> (c) unemployment compensation law;
> (d) compulsory benefit act or law; or
> (e) other act or law of like intent.

*Id.* Weighing these five factors, the court found that defendant was entitled to offset the disability payments made to plaintiff. *Id.* Therefore, defendant's benefit plan was not considered a fringe benefit.

DuPont's Incapability Pension benefits and T & P Plan are similar to the Plan described in *Ruberto* and the facts of *Allen*. It is uncontradicted that DuPont's disability plans are solely employer funded and did not result from a collective bargaining agreement. Although DuPont's plan covers injuries that are work and non-work related, and requires some duration of employment to qualify, the Court finds dispositive the fact, as the Fifth Circuit had in *Phillips*, and the district courts had in *Ruberto* and *Allen*, that DuPont had specifically provided for a setoff in their policy.

DuPont's T & P Plan provides benefits to the extent that the employee's benefits from other sources do not equal sixty-percent of the employee's normal monthly salary. Payments by DuPont under the T & P Plan are offset by, *inter alia*, Social Security, Workers' Compensation and Incapability benefits. It is evident that the payments already received by Plaintiff, and payments he will continue to receive from Defendant under the Incapability Pension and T & P Plan were, and continue to be, made pursuant to a plan intended by DuPont to provide for DuPont's indemnification against liability. As such, the Court finds the character of these benefits to not be fringe in nature.

Accordingly, for all the reasons set forth herein, it is this day **ADJUDGED, DECREED AND ORDERED** that Plaintiff's Motion to Exclude Evidence of Disability Payments, be and is, hereby **DENIED**. Having answered the proposed certified question presented by Plaintiff in this Order, the Court finds the request for certification to the Supreme Court of West Virginia to be hereby **DENIED** as **MOOT**. Finally, the Court hereby **DENIES** the joint request for a 120 extension of the trial date, as the Court has resolved the primary disputed issues presented in the parties' dispositive motions.

The Clerk of the Court is hereby directed to **mail and fax** copy of this Order to all counsel of record.